STATE of Delaware,

v.

Joseph A. SHIELDS, Jr., Defendant.

Superior Court of Delaware,
New Castle County.

Submitted: Nov. 9, 1990.
Decided: Nov. 15, 1990.

Kathleen Jennings, and Jeffrey M. Taschner, Deputy Attys. Gen., Dept. of Justice, Wilmington, Del., for the State.

Nancy Jane Perillo, Asst. Public Defender, Wilmington, Del., for defendant.

## OPINION

BARRON, Judge.

The Court, at defense counsel's request, conducted a Competency Hearing which commenced on September 24, 1990 and ended on October 4, 1990 to determine the competency of Joseph A. Shields, Jr., to stand trial on two counts of Murder in the first degree, one count of Unlawful Sexual Penetration in the first degree and one count of Unlawful Sexual Intercourse in the first degree. Additionally, oral argu-

ment was had before the Court on October 19, 1990, and on November 9, 1990, the Court conducted an interview with the defendant. The case is now ready for decision.

## BACKGROUND

The defendant, Joseph A. Shields, Jr., is a 19 year old young man who is slight of build with an appearance of one younger than his years. On or about April 8, 1990, he allegedly raped and murdered a seven year old female, Brenda Coxe. Almost immediately following the defendant's arrest on April 10, 1990, defense counsel apparently questioned her client's competency and sanity, for within days of the arrest Stephen Mechanick, M.D., a psychiatrist, and Irwin Weintraub, Ph.D., a clinical psychologist, both hired by the defense, had each conducted their first interviews of the defendant at Gander Hill prison.

But, as the evidence adduced at the competency hearing made clear, the defendant's involvement with psychiatric/psychological evaluation and treatment commenced years earlier when the defendant was a child. A review of that history as presented by defense counsel in the course of the competency hearing is in order so as to capture as complete a portrait as possible of this troubled and disturbed young man.[1]

In September, 1978, when the defendant was 7 years old,[2] he was referred by his School Psychologist to the Child Diagnostic and Development Clinic (CDDC) of the Alfred I. duPont Institute for an evaluation. A year earlier, in 1977, the School Psychologist, William Shaw, evaluated the defendant and found him to be functioning in the borderline range. At age 5, he had been enrolled in the Developmental Pre–School Program within the Claymont School District. Thereafter, he attended the Diagnostic Prescriptive Training Center in the same district.

The CDDC Psychological Report dated September 13, 1978 indicated that his current intellectual performance was measured and found to be as follows: Full Scale Score of 70 (in the borderline average range); Verbal Score of 60 (in the mildly retarded range); and Performance Score of 82 (in the low-average range). The Report's Summary stated, in pertinent part, as follows:

> ... Joey is seen as a young man of uneven intellectual development who has a serious language disorder. His language functioning is in the mildly retarded range of functioning. This is primarily manifested in his difficulty in taking in auditory information from the world and in processing and organizing this material in a coherent way for verbal expression....[3]

When the defendant was 10½ years of age, on October 13, 1981, he was admitted to the Terry Children's Psychiatric Center (TCPC), Inpatient Program, for what was expected to be an extended 90–day evaluation. He was referred by his mother, Rosemarie Shields, who related that the defendant had recent incidents of fire-setting, burning papers in his apartment complex, setting his bed and his grandmother's rug on fire, lying and stealing.[4]

A psychological examination was performed on January 21 and January 22, 1982 while at the TCPC. This time, the defendant achieved a Verbal Score of 58, a Performance Score of 81 and a Full Scale Score of 68. Chief Psychologist George Frangia noted in his report that the "test scores seem to indicate that Joey is a learning disabled boy who would have special difficulty in the area of reading. There is a possibility of diffusive brain damage which would affect his scholastic ability.... While he is distractable he is able to concentrate at times. His thought processes seem rather concrete and may tend to fragment when he is placed under pressure."

1. It must be understood that what follows is merely a capsule of the voluminous record of the defendant's mental/emotional history.

2. The defendant was born on May 4, 1971.

3. *See:* Defendant's Exhibit 1.

4. The Terry Children's Psychiatric Center Reports are found as Defendant's Exhibit 2.

A psychological evaluation performed on October 15, 1982 reflected an apparent regression: "Evaluation results indicate Joey to be a very insecure boy with underlying emotional pathology of a quite serious nature. His ability to perceive reality accurately is significantly impaired, and there is evidence of cognitive slippage. Taken together, these facts suggest the presence of an underlying (or developing) thought disorder." In his Summary, Staff Child Psychologist Thomas J. Hebeisen, Ph.D., opined that the defendant's "inner resources are quite limited, and his capacity to accurately understand and effectively deal with his environment is highly impaired."

Later, on July 26, 1983, when the defendant was 12 years of age, Dr. Hebeisen noted that "Joey has exhibited a significantly improved adjustment since his last psychological evaluation (10/82). In particular, there has been a notable decrease in 'retreat' into fantasy and a generally improved and more stable reality orientation. In class, he has been able to remain more task-oriented and does not typically present any behavioral difficulties. However, despite these gains, it is clear that Joey remains a seriously disturbed youngster who will require continued specialized services after his discharge at the end of this summer."

On July 25, 1983, Speech Pathologist Kamala Prasad also had found improvement in the area of speech and language. On November 25, 1981, she had found the defendant to be "a 10½ year old boy with a central language problem. Major areas of weakness are (1) auditory memory, (2) temporal concepts, (3) abstract thinking, (4) grammar, and (5) auditory discrimination." In July of 1983, however, she stated that "Joey has improved considerably in his ability to attend, listen to verbally presented material, answer questions about the main idea as well as details, and recall the information several days later. He is very motivated to acquire new information and can listen semi-independently to audio-cassettes (for 15–20 minutes) on topics of general interest."

His Case Manager, Child Psychiatrist Anita L. Amurao, M.D., noted in her Treatment Plan Review No. 9, dated May 13, 1983, that "Joey showed consistent improvements in ego functioning and was transferred to full Day Hospital on 4/25/83. Though he did not show any evident behavioral regression, his individual sessions during this period reflected increasing pressures to 'grow up' and deal with reality; there has been an increase in tall tales for the past six weeks and his fantasies often start with a reality issue.

We are pleased with his progress and there are no changes in the treatment plans except for his medication. We plan to increase the dosage of Mellaril to determine if he can reach a higher level of functioning...."[5]

On August 23, 1983, the defendant was discharged from the TCPC as "Improved."[6] At the time of his discharge, he was functioning at a first-grade level in reading, spelling and math. His ability to

5. In 1982, the defendant was put on Ritalin for approximately 8 weeks with no real changes noted. Ritalin is a mild central nervous system stimulant, used in treatment of Attention Deficit Disorders as "an integral part of a total treatment program which typically includes other remedial measures (psychological, educational, social) for a stabilizing effect in children with a behavioral syndrome characterized by the following group of developmentally inappropriate symptoms: moderate-to-severe, distractibility, short attention span, hyperactivity, emotional lability, and impulsivity." Physician's Desk Reference 866 (44th Ed.1990).

Mellaril was started on October 28, 1982. Mellaril is a neuroleptic (antipsychotic) drug used in "the treatment of severe behavioral problems in children marked by combativeness and/or explosive hyperexcitable behavior out of proportion to immediate provocations and in the short-term treatment of hyperactive children who show excessive motor activity with accompanying conduct disorders consisting of some or all of the following symptoms: impulsivity, difficulty sustaining attention, aggressiveness, mood lability, and poor frustration tolerance." *Id.* at 1940.

At the time of his discharge from the TCPC, the defendant was still receiving 10 milligrams of Mellaril daily.

6. What was to have been a 90–day placement at TCPC turned out to cover more than 1 year and 10 months.

concentrate on his assignments was poor, frequently daydreaming or being distracted by outside stimuli. While having a very low frustration level, he was usually cooperative, pleasant and cheerful, interacting well with his peers.

The recommended release plan called for the defendant to attend Springer Intensive Learning Center in September, 1983, with Delaware Guidance continuing with outpatient treatment.

Testifying with regard to the defendant's involvement with the TCPC were Inez Hanson, a Psychiatric Social Worker, Charles Sample, a Social Worker, Dr. Thomas Hebeisen, a Clinical Psychologist, and Dr. Anita Amurao, a Child Psychiatrist.

Dr. Hebeisen placed the defendant's Full Scale Intelligence quadrant within the mild range of mental retardation. Dr. Amurao's final diagnosis at discharge was child schizoid disorder, mixed developmental learning disorder and borderline personality disorder. She felt that the defendant would show regression in ego functioning under stress. At the time of his discharge from TCPC, the defendant was 12 years old.

By age 13, the defendant was again being evaluated because of management problems.[7] The evaluation was conducted by Leighton Jones, M.D., of the Delaware Guidance Services For Children And Youth, Inc., and took place on July 20, 1984. Dr. Jones noted the defendant to have an extremely short attention span. He further noted that the defendant was quite impulsive and distractible and had a very rich fantasy life. It was noted that the Mellaril had been discontinued following the defendant's release from the TCPC. Dr. Jones' impression was that "Joseph is a boy with long-standing neurological problems which include both learning disability and attention deficit disorder with hyperactivity...."

Dr. Jones performed a second psychiatric examination on December 5, 1984. He noted that at the end of October, 1984, the defendant had attempted to set fire to himself following an incident of teasing by peers at school. Dr. Jones noted that upon interviewing the defendant, he appeared to be a very cooperative boy who was oriented in all spheres. (There was some question of his reality testing.) The defendant spoke of being angry and when he is angry, he admitted that he wanders off, sometimes not knowing where he is going. Dr. Jones recommended that the defendant was in need of a setting which provides a maximum amount of structure and supervision where his tendency to wander could be monitored and controlled.[8]

The defendant was treated off and on at Delaware Guidance Services from June 8, 1984 until December 5, 1984. His discharge diagnosis was Adjustment Disorder with Anxious Mood and Mixed Specific Developmental Disorder. Kenneth Johnson, a Social Worker, and Leighton W. Jones, M.D., testified for the defendant at the competency hearing. Mr. Johnson testified that both he and Dr. Jones had concluded during their period of treatment that outpatient therapy would do no good for the defendant who, they felt, needed an inpatient facility.

On January 16, 1985, the defendant was admitted to the Rockford Center where he remained until May 31, 1985. He was admitted for bizarre behavior which included wandering behavior, having a poor sense of time, short attention span and poor concentration skills. He was known to be a liar and was unable to get along with his peers. He often engaged in self-destructive behavior.[9]

In the January 17, 1985 Social Assessment, a social worker noted the present problems:

> The informant depicts the patient as displaying wandering behavior and having a very poor sense of time and is

---

7. The defendant had spent the prior school year at Springer Intensive Learning Center without making any substantial gains. He was reading and spelling at the 1st grade level; his arithmetic was at the 2nd grade level.

8. *See generally:* Defendant's Exhibit 5.

9. *See:* Defendant's Exhibit 3.

described as having a short attention span, and poor concentration skills. At times, he cannot remember information that he learned the prior day. He often seeks attention from others by distorting the truth with exaggeration, resorting to a fantasy world, and mimicking animals. He associates with children much younger than he and feels pressured by peers his age. Joey often has lack of self-confidence and a poor self-esteem. He is described as a very immature and emotional child who cries easily. During the admission procedure at Rockford Center, Joey talked about an imaginary friend, Wolfer. Joey tends to be truant from school and runs around hiding in apartments. During the fall the informant described Joey as taking a knife to his stomach and threatening to kill himself and on Halloween night he was found attempting to burn himself with matches. During another occasion while he was visiting his father in New Jersey, Joey was walking their dog, Peaches, he was found by the police on an industrial site where the dog had ended up in the pit and died. The informant is unsure whether or not Joey intentionally threw his dog in the pit or if the dog had accidently fallen into the pit. Mr. Merrell, a Division of Child Protective Services social worker, collaborated with Delaware Child Guidance and they contacted Dr. Garbayo who psychiatrically evaluated Joey and suggested that he be hospitalized at the Rockford Center. As a result, Joey became a patient at the Rockford Center under the treatment of Dr. Garbayo.

The Rockford Center Discharge Summary dated May 31, 1985 summarized the defendant's clinical course:

Patient was admitted to the Adolescent Treatment Center. At the time he was diagnosed as an undersocialized conduct disorder, aggressive. He was seen in consultation by Dr. Graff, who noted his bizarre behavior which alienated him from his peers. Dr. Graff also noted a history of self destructive behavior and lashing out. Dr. Graff noted learning disability. The question of childhood schizophrenia was raised. He was transferred to Dr. Graff's service. He was treated for a long period of time on the adolescent unit. It was noted that he had extremely poor self esteem and was quite annoying to staff and to peers. He engaged in self destructive behavior. Goals of the therapy were to help him end his self destructive behavior, recognize his behavior patterns and to increase self esteem. One important issue was that he was called "Joey". After discussion with patient and the floor, we were able to drop the childlike nickname and to give him a more age-appropriate name—"Joe". Therapy was supportive in terms of helping him develop his self esteem. He worked hard to achieve the proper number of points, but seemed unable to achieve that over a period of time. It became clear that further placement would be necessary, and referral to Devereaux School was made.[10] Work-up continued up to the time of discharge.

On June 24, 1986, the defendant was readmitted to the Rockford Center. He remained until discharged on July 30, 1986. At discharge, he had a principal diagnosis of Attention Deficit Disorder with other diagnoses of Narcissistic Personality Disorder and Undersocialized Aggressive Disorder. The chief complaint was noted as follows: "The patient killed the family cat in a fit of rage." [11]

10. The defendant never was placed in the Devereaux School because of the expense.

11. *See:* Discharge Summary dated July 30, 1986, found within Defendant's Exhibit 3. *See also:* Social Worker Susan Bondreaux's Social Assessment Update dated June 24, 1986 which details this chief complaint (principal reasons for referral) as follows: "On June 19, 1986, Joey killed the family cat. Joey's story is that the cat scratched him and he punched the cat in the stomach and the cat died. He then buried it. When he found out that the cat died, father asked Joey to show him where it was buried. Joey took father into the woods, but was unable to show him where the cat was buried. Father said they weren't leaving the woods until they found the cat. Joey then said the cat was in the lake and he would show his father there. They went to the lake and Joey pulled the cat out of the water with a noose around his neck. Father thinks Joey drowned the cat after strangling it.

Under the heading Family And Past History, the July 30, 1986 Discharge Summary notes:

> After his [first] discharge from the Rockford Center, he had gone to live with his mother, maternal grandfather and his mother's boyfriend. He visited his father on weekends. Two incidents caused the patient to live with his father: His grandfather died and the second is that there were physical abuse threats to the patient by a neighbor who accused the patient of harming his small daughter. Following that, he moved in with his father and his father's girlfriend. The family had hoped that the patient would learn to control himself while a patient at the Rockford Center.

With regard to his mental status, the July 30, 1986 Discharge Summary noted:

> At the time of admission, the patient was casual, cooperative, with a spontaneous manner. His motor activity was increased. His care functions were ambulatory. His speech was coherent and the content was relevant. Productivity was spontaneous. His mood was normal and consistent. Common sense, however, was poor and chief complaint judgment was poor. There were no preoccupations. Death wishes were absent. Delusions and hallucinations were absent. He was oriented and his memory was intact but his intelligence was below average. Psychological evaluation reported that the patient showed an oppositional disorder with over anxious features.
>
> His condition at discharge was found to be "Much improved in that he was able to control his behavior in the hospital. He only manifested one period of difficulty acting out an aggressiveness."

Harold Graff, M.D., a psychiatrist with the Rockford Center and Frederick Kozma, Ph.D., a psychologist who, in 1985 was with Youth Diagnostic Center, testified for the defendant with regard to the defendant's Rockford Center treatment.

He also states (he says this is hearsay), that a neighbor said he saw a boy like Joey take their rabbit from the back yard and then punch it and kill it. This happened about a month ago."

Dr. Graff testified that he sees "Joey as very disturbed," yet admitted in cross-examination that he had not seen the defendant since 1986. He admitted that during the defendant's first stay at the Rockford Center, there was nothing indicated to him that the defendant was mentally retarded. Nor was there evidence of hallucinations or delusions. He saw no signs of childhood schizophrenia. Dr. Graff felt that structure was very important for the defendant's achievement. The doctor also stated that he and the defendant were able to communicate.

Dr. Kozma evaluated the defendant on May 24, 1985, prior to his first discharge from the Rockford Center. He found the defendant to be basically cooperative and that the defendant was interested in relating to him. The defendant participated freely, but as time went on, he became fatigued after about one hour. He diagnosed the defendant with having Attention Deficit Disorder, residual type; Developmental Reading Disorder; and Developmental Arithmetic Disorder. He testified that his diagnoses were consistent with prior evaluations. He felt that the defendant had satisfactory reality contact, an adequate ability to assess his environment and was functioning reasonably well in the absence of stress. Dr. Kozma recommended a school program designed to aid learning disabled children and a consistent program of behavioral management both at home and at school.[12]

Both parents of the defendant testified at the hearing. The defendant's parents separated in July, 1982, and were later divorced. The father, Joseph Shields, Sr., testified that since the defendant's stay at TCPC, he has had a very short attention span. He pointed out that his son has real difficulty concentrating, retaining information and following directions. He stated that the defendant cannot read a newspaper or even a first grade primer and that he cannot read the face dial of a clock.

12. *See:* Defendant's Exhibit 4.

The defendant's father stated that even at age 18, the defendant played with 6 or 7 year olds rather than his peers. Mr. Shields was of the opinion that his son could not understand the charges or proceedings against him, nor did he see how the defendant could assist his counsel. He felt that his son could not understand or remember testimony.

The defendant's mother, Rosemarie Shields, recounted her sons's development problems and his earlier admissions to treatment facilities. She stated that he doesn't comprehend long sentences. She noted that it takes him 15 minutes to write down a telephone number. Mrs. Shields also believes that her son could not assist counsel or understand the legal procedures concerning his case.

John Brower, Mrs. Shields' boyfriend, testified that prior to the defendant's incarceration, both he and the defendant worked at a Philadelphia branch of Thriftway, he as a meat-cutter, the defendant as a helper. He stated that the defendant was only given menial jobs because he was so slow. Mr. Brower stated that he had to sometimes repeat instructions and even physically demonstrate in order for the defendant to understand directions. He described the defendant as a pretty good employee who could be interested in an assignment for awhile but that he couldn't seem to stay in one place.

Other background witnesses included Jane Madding, an Educational Diagnostician with the Springer Intensive Learning Center, Sherry Goff, Coordinator, Child Study Team, with the Clayton Public Schools of Clayton, New Jersey, Arlene Koeferl of the Clinical Services Division of the Department of Services to Children, Youth and Their Families (formerly called the Youth Diagnostic Center), and Sandra McKinley, an acquaintance of the Shields family who coached the defendant in roller skating when the defendant was 15 and 16 years of age. She noted that the defendant had good coordination but that he could not remember the skating routines that she tried to teach him. Also, the defendant's school records[13] were introduced in evidence. There is no need to recount at any great length all of this testimony and evidence. Suffice it to say that the portrait of the defendant as a learning disabled young man with significant perceptual deficits remained rather constant.

In June, 1989, the defendant graduated from the Clayton Public Schools where he had been enrolled in a special course at Abilities Center of Southern New Jersey, Inc. since September, 1988. James Moore, Rehabilitation Counselor with the Abilities Center, noted in his End of Year Report— 12/27/88 to 5/24/89 that, according to the defendant's supervisor for the period January through March, 1989, "the most dramatic improvements in Joseph's performance were in the areas of initiative, attitude and concentration."[14] The same report noted that in April and May, 1989, the defendant worked in the food service training area and that "since his transfer into the food service area, his attendance and desire to earn his high school diploma has increased dramatically." Mr. Moore recommended that the defendant be awarded his high school diploma for Clayton Public Schools, with placement in competitive employment immediately thereafter. He also recommended that consideration be given to lifting the defendant's probationary status with this State in July of 1989 "because of his academic and vocational progress at the Abilities Center."

The probationary status mentioned by Mr. Moore in his May 24, 1989 report referred to a 1 year period of probation imposed by Delaware Family Court Judge John T. Gallagher on July 18, 1988. On that date, the defendant pleaded guilty to one count of Reckless burning in violation of 11 *Del.C.*, § 804. The defendant had been represented by counsel. Both parents were present for this Family Court pro-

---

13. *See:* Defendant's Exhibits 6 and 7.

14. *See:* Defendant's Exhibit 7. An earlier report, (Joseph Shield's Progress Report—9/8/88 to 12/23/88) noted that the defendant "needs to improve in the areas of initiative, attendance, promptness and concentration."

ceeding wherein Judge Gallagher found as follows:

Respondent advised the Court that he understood and accepted the plea agreement that he understood the possibility of incarceration, that according to his perception he has been fully advised by counsel on the premises and that he knew that the Court was not bound by the agreement or its recommendation. He was prepared to enter a plea of guilty to one of the two charges of reckless burning.

Before accepting the guilty plea I interrogated respondent with respect to the questions required by *Brown v. State* [15] and after considering the totality of the circumstances I am satisfied that the guilty plea has been knowingly and intelligently made and the record shows and the Court finds that respondent is, in fact, guilty of the offense to which he pled guilty. Thereupon, the guilty plea was accepted by the Court.

I listened to the comments of counsel and those of Mr. Shields. Apparently Mrs. Shields has been deeply into this matter and has helped arrange for respondent's acceptance into the Abilities Center program. Respondent is also to attend the First Starter Course conducted by the State Fire Marshall. These are serious charges which could have resulted in serious threat to life and property. [16]

While Mr. Moore noted the defendant's dramatic improvement in the End of Year Report—12/27/88 to 5/24/89, and while a Delaware Family Court Judge found the defendant to have knowingly and intelligently entered a plea of guilty to Reckless burning in July, 1988, the defendant's impairments could not be seriously doubted during this period of his life. On November 22, 1988, Dr. John A. Visceglia, tested the defendant's intelligence using the Wechsler Adult Intelligence Scale as the testing instrument. On this occasion, the defendant scored a 71 on Verbal, an 87 on Performance and Full Scale of 77. Dr. Visceglia noted that the defendant continued to score at borderline levels intellectually with considerable deficit in all verbal areas. He also noted significant perceptual deficits.

In a December 8, 1988 evaluation, Sherry Goff, the Learning Disabilities Consultant, found the defendant to be functioning at the pre-primer level in reading, at the first grade level in spelling and at the second grade level in math. She also noted that the defendant had "severe perceptual and language deficits which appear to be negatively impacting upon his academic progress." [17]

Stephen Mechanick, M.D., a licensed Pennsylvania psychiatrist, testified for the defense. Pursuant to defense counsel's request, he saw the defendant for psychiatric evaluation on April 28, 1990. Prior to this evaluation, Dr. Mechanick reviewed the search warrant affidavit of probable cause, the indictment, the Brandywine School District records, as well as records from the Abilities Center of Southern New Jersey, the TCPC and the Rockford Center.

The evaluation took place at Gander Hill prison and, after being introduced to the defendant by defense counsel, lasted for 2¼ hours. [18] Under the heading Mental Status Examination, Dr. Mechanick wrote:

Mr. Shields was an alert white male who appeared his stated age. He was dressed in prison uniform and he was well-groomed. His hair was cut very short in the front and long in the back. Mr. Shields was pleasant and cooperative throughout the interview. His speech was normal in rate and tone. His affect was immature and childlike. He smiled throughout the interview and appeared slightly anxious. He did not appear sad

---

15. *Brown v. State,* Del.Supr., 250 A.2d 503 (1969).

16. *State of Delaware in the interest of Joseph Shields,* Del.F.C., Petition No. 88–4–236–2, decision by J. Gallagher dated July 18, 1988. *See:* Defendant's Exhibit 7; State's Exhibit 1.

17. *See:* Defendant's Exhibit 7.

18. *See:* Dr. Mechanick's report dated May 2, 1990, with regard to the April 28, 1990 evaluation. The May 2, 1990 report is contained in Defendant's Exhibit 8.

or angry during the interview. He reported his mood as "high, trying to keep happy, nervous. Reading the Bible a lot."

Mr. Shields' thought processes showed circumstantiality and tangentiality. There was no loosening of associations. Mr. Shields denied ideas of reference or paranoid ideation. He said that he believes in UFO's and ghosts, and that he saw a ghost once when he was in a house in Claymont. He denied any violent, homicidal, or suicidal ideation. He denied visual, auditory, olfactory, gustatory or tactile hallucinations.

Mr. Shields was oriented to person, place and time. He was able to repeat 4 digits forwards and 3 digits backwards. When asked to recite the Presidents of the U.S. backwards he named Bush, then Reagan, and then Roosevelt. His calculations were as follows:

One dollar less 7 cents = 75 cents

$20 - 3 = 15$

$4 + 7 = 11$

$8 + 6 = 14$

When asked to say how a bus and an airplane are similar he said "transportation." When asked how milk and water are similar he said "liquid." Mr. Shields interpreted "Every cloud has a silver lining" as "A time will come. Something to hope for." He interpreted "People in glass houses should not throw stones" as "They are in glass houses, they shouldn't throw stones. The stones could go somewhere and hurt someone."

Mr. Shields had difficulty drawing a clock, putting the number on the face and drawing the correct time. There were some errors in his copying of a three-dimensional box. When asked to write "A quick brown fox" he wrote "coqi fox bren."

When asked what he would do if he smelled smoke in a theater he said "Walk up to the front entrance and yell fire. I'd be the first one out instead of being run over." When asked what he would do if he found an envelope on the street that had an address and a stamp on it he said "Take it straight to the post office. They will know what to do with it."

Under the heading, Understanding Of Legal Process, Dr. Mechanick wrote:

Mr. Shields said that Ms. Perillo is "Public Defender. Sort of a lawyer." When asked to say more he added "It's a two-way team. She talks off in court, another lawyer goes through the records. They are to help you out in court. Defend your case."

Mr. Shields said there are two charges against him. One is "sexual assault", which means "like having intercourse with a person, penis right in her anaminus." (sic) I asked him to explain this and he said "between the legs." He did not know why this was wrong. When asked whether it is wrong to have intercourse with a child or against someone's wishes he said that these were wrong. The other charge he identified as "murder" and said this meant "the person's dead." He said it is wrong to kill a person.

Mr. Shields did not know who was charging him with these crimes. He said that he would go to court where it would be decided whether he did these things. He said that the judge would decide, also the jury would decide. The jury is "a bunch of people sitting in chairs who hear both sides and decide." When asked what the person representing the state does, he said that this person "tries to prove you did it."

Dr. Mechanick, in his May 2, 1990 report, concluded as follows:

It is my opinion, based on reasonable medical certainty, that Mr. Shields is mentally ill. It is my opinion, based on reasonable medical certainty, that Mr. Shields' mental illness does not currently impair him to a degree that he is unable to comprehend the nature of the charges against him.

It is my opinion, based on reasonable medical certainty, that Mr. Shields' mental illness does not impair him such that he is unable to assist his attorney in the preparation and conduct of his defense.

On May 26, 1990, Dr. Mechanick evaluated the defendant for a second time, again at Gander Hill prison. The purpose of this interview was to discuss with the defendant the events surrounding the crimes for which he now stands charged with committing and the circumstances surrounding his statements given to the police.[19] Dr. Mechanick recorded the results of this interview in his Psychiatric Evaluation dated June 13, 1990:

I asked Mr. Shields to describe what had happened on April 8, 1990. Mr. Shields said that on that day his brother Jimmy had asked him for $20. Jimmy had bought parts for a four-wheeler vehicle that the two brothers shared and wanted to be paid back. Mr. Shields asked John, his mother's boyfriend, for the money. John became angry with Jimmy and yelled at him. Jimmy yelled at John for not letting Joseph do what he wants, for instance, not letting Joseph buy a dirt bike.

John became angry with Jimmy and said that he did not want Jimmy around. The boys mother then became angry with John and said that it was not his right to kick Jimmy out of the house. John attempted to hit the boys' mother, and this angered the boys.

Following this argument Mr. Shields went upstairs to be alone and "to cool out." His mother later came up and asked him nicely to come downstairs. Mr. Shields told her he was going outside. His mother told him to come back inside around 6 o'clock, which would have given him approximately ten minutes outdoors.

Mr. Shields did not come in at 6 o'clock because he was still angry. While he was outside, Brenda Coxe came up to him and asked where her brother was. Mr. Shields told her he did not know where her brother was. He then started to walk towards the house of Rob, a friend of his. He walked down a path towards the "triple tunnels." These are three tunnels through which the creek passes. He said that this was the route he was taking to go to Rob's house.

Mr. Shields stopped at a rope swing before he got to the triple tunnels. He thought he might be able to get his anger out by swinging out over the creek on the rope swing. He went on the swing but still could not get his anger out. During this time at the rope swing, Ms. Coxe talked about how she was going to get her brother in trouble. She said that she was going to try to get him grounded. Mr. Shields said to her, "Could you please leave?" and she said, "No."

Mr. Shields then walked away very quickly to try to leave her, but Ms. Coxe followed. He told her to leave two more times. The third time he told her to go he was at "Big Ben." He said that Big Ben is a large rock which slopes down into the water of the creek. After Mr. Shields told Ms. Coxe for the third time to go he said he "couldn't control (his) anger and blew up." Mr. Shields pushed Ms. Coxe away from him and she went into the water. He did not remember what he was thinking at the time he pushed her. He added that the police have said that Ms. Coxe hit her head when she went into the water.

Mr. Shields was unable to estimate how long Ms. Coxe was in the water. He could not remember if she was moving or still while she was in the water. He said that it was dark in the woods at that time. Mr. Shields could not remember what he was thinking during this period. He did not know during this period whether Ms. Coxe was alive or dead.

Ms. Coxe's body came floating to the surface of the water with her face down in the water. After Ms. Coxe came to the surface of the water, Mr. Shields stepped into the water and pulled her out. He initially used a stick to grab hold of her and pull her towards him. He said he would not dive into the water at that time because it was ice cold. He

---

**19.** In comparing the statement of the events surrounding the crimes given to Dr. Mechanick (Defendant's Exhibit 8) with his taped statement given to the police (State's Exhibit 9), the Court notes a basic consistency between the two statements.

added that if he had not pulled her out she would have floated to the Phoenix Steel Plant and have been sucked into the pipes. He said that the pipes contained blades that spin very quickly and that if Ms. Coxe floated into them "that would have made Phoenix Steel uptight."

After Mr. Shields pulled Ms. Coxe part of the way towards him with the stick, he got hold of her with his hands and pulled her out of the water. He then hit her once in the stomach with his fist. He said that he does not know why he did this and that he was confused at the time. Mr. Shields then took a stick and said that he rammed it into Ms. Coxe's mouth. He does not remember what he was thinking at the time he did that, but said that he was feeling a lot of anger. He then added "most body sensors are in the throat. I thought ramming the stick in her mouth would make her throw up water."

Mr. Shields then walked away. He said that his radio, which he had brought with him and is the size of a "boom box," had slid into the water and he went to get it out. He put the radio on a spot of land where there was dirt. He then picked up another stick and stabbed it into Ms. Coxe's "crotch area." He does not know why he did this but added "there's where I was not thinking right." He next threw a rock, which was approximately a foot in diameter and weighted approximately five pounds, at Ms. Coxe's head and crushed her head. He demonstrated to me a distance of approximately four feet which he believed was the distance he was standing from Ms. Coxe when he threw the rock. Mr. Shields did not know why he threw the rock. After throwing it he said "fuck" and walked away. He then thought "I did something wrong, so I might as well go home and tell my mother."

Mr. Shields walked home from the direction he had come. Before he got to his house he saw Ms. Coxe's brother who asked him if he had seen her. Mr. Shields denied having seen her. He then went in his house, and his mother and brother accused him of having taken someone's dirt bike without permission. He got angry with them, went upstairs and went to sleep without telling them what he had done. The next day he got up and went to work as usual. He said that he (sic) day was uneventful and that he did not think about what he had done the previous day.

Following his initial evaluation of April 28, 1990, Dr. Mechanick received from defense counsel other documents concerning the defendant. Based on this added information, including Dr. Irwin Weintraub's Psychological Evaluation, as well as his further interviews of the defendant, Dr. Mechanick, by letter to defense counsel dated September 4, 1990, changed his opinion with regard to the issue of competency.[20] He wrote:

I am writing to advise you of my opinions regarding two issues in the case of Joseph Shields. The first issue is whether Mr. Shields was capable of adequately understanding and waiving his Miranda rights on April 9, 1990 and April 10, 1990. The second issue is whether he is mentally competent to stand trial.

My opinion on these two issues are based on the following data: (1) my psychiatric examinations of Mr. Shields on April 28 and May 26, 1990, (2) review of documents concerning Mr. Shields and this case, (3) evaluation of an audiotape of his statement to the police on April 10, 1990, (4) discussion with Dr. Irwin Weintraub concerning the results of his psychological evaluation of Mr. Shields, (5) discussion with you concerning what is required of Mr. Shields to assist in preparation and conduct of his defense.

It is my opinion, based on reasonable medical certainty and this information, that Mr. Shields has both mental illness and mental defect. His mental defects include his mild mental retardation, developmental arithmetic disorder, developmental reading disorder, and developmental expressive and receptive lan-

---

**20.** Also important in his change of opinion was his listening to the defendant's taped statement and discussions he had with Dr. Weintraub and defense counsel.

guage disorders. Mr. Shield's mental illnesses include attention-deficit hyperactivity disorder and conduct disorder.

It is my opinion, based on reasonable medical certainty and this information, that Mr. Shields was not capable of adequately understanding and waiving his Miranda rights on April 9, 1990 and April 10, 1990.

Due to his mental illness and mental defects, it is also my opinion at this time, based on reasonable medical certainty and this information, that Mr. Shields is not capable of understanding the nature of the proceedings against him, and he is not able to give evidence in his own defense or instruct counsel on his behalf.

Dr. Mechanick's September 4, 1990 opinion was strengthened, he testified, as a result of interviewing the defendant after the September 25, 1990 court session. Of his understanding of the competency hearing, the defendant remarked to Dr. Mechanick that "We were here to hear people talk."

Dr. Irwin Weintraub, a Consulting Psychologist and Diplomate in Clinical Psychology, interviewed the defendant on April 19, 1990, May 9, 1990, May 18, 1990, July 11, 1990 and July 26, 1990. All interviews occurred at the Gander Hill prison. In his report (Defendant's Exhibit 10), Dr. Weintraub noted that "Joey knows the charge placed against him, the reason for incarceration, the general roles of the Judge, jury, prosecuting and defense attorneys." [21] His general impression of the defendant from observation of appearance and behavior is that the defendant is of "significantly below average reasoning, very poor stress tolerance, social, emotional and behavioral immaturity equivalent to the preadolescent developmental level, minimal insight concerning his low functioning adjustment/achievement, weak self-image, strong dependency needs and susceptibility to manipulation."

The results of the Wechsler Adult Intelligence Scale–Revised, administered to the defendant by Dr. Weintraub were as follows:

Verbal IQ: 68 (Defective)

Performance IQ: 83 (Dull Normal)

Full Scale Intelligence: 73 (Borderline)

Based upon the Wechsler Adult Intelligence Scale–Revised, and other psychological/intelligence tests including the Wide Range Achievement Test–Revised, the Wechsler Memory Scale–Revised, Bender–Gestalt with Memory, House–Tree–Person, Rorschach, Sentence Completion Test (Oral) and the Minnesota Multiphasic Per-

---

**21.** Dr. Weintraub also asked the defendant to explain the events leading up to his incarceration. This account is contained in Dr. Weintraub's report as follows:

"Concerning what occurred leading to the charge, Joey was involved in a serious argument with the family which included his mother, her 'boyfriend', and his brother. 'Went outside with my brother. My brother said to head home. I didn't head home, I just went down to the woods and walked around. That's when that little girl came down there asking all those questions. I told her to go away. She wouldn't go so I threw her in.' Where did you throw her in? 'In this creek water where the incident happened.' What incident? 'Where she died.' What made her die? 'The jagged rock on the bottom.' What did you do after you threw her in? At that time, my anger went out of control.' What happened? 'I really don't like to talk about it. Got to anyway. Stuck a stick in her throat, I don't know why.' Then what did you do? 'Nothing else. Stuck the stick in her mouth. They're trying to say I stuck the stick up her crotch.' Did you do that? 'I did. They're trying to say I stuck it through her belly button but that I didn't do.' What happened after that? 'Last thing I remember doing is hitting her over the head with a big rock.' Then 'Just left and went home.'

Joey believed that the victim, Berenda (sic) Coxe, had died 'probably from the water.' He recalls the victim looked like, 'Just a regular person,' after the attack. He saw no blood because, 'Couldn't see shit out there in the woods. It was six o'clock.' He returned home and, 'Got in a major argument again with my mother and brother this time' about, 'Stupid dirt bike. My brother tried to say I took his out for joy riding and I didn't.' Until arrested, Joey did not recall the event and he is unable to remember or describe his feelings. He now does, 'Think about the girl all the time,' and, 'That I wish I didn't do it. That I could have talked to my mom's boyfriend instead or a friend. Then bring the problems out. I'm just plain upset, I can't explain it.' "

sonality Inventory,[22] Dr. Weintraub's analysis was as follows:

*Intelligence:* General functioning ranges from mental defective, mild to borderline defective. This is consistent with former intelligence test results. Scholastic achievements in the basic core subjects of reading, spelling and arithmetic test at third grade level and substantiate limited ability to learn. Special education placement was required from the onset of schooling.

Reasoning is potentially sufficient for everyday simple tasks where he is familiar with requirements and is not under felt stress to produce quickly or accurately. Reasoning is blocked when intellectual and/or emotional demands exceed borderline skills so that he cannot organize thoughts, solutions and reactions in a rational, controlled, successful manner.

*Language:* Reading and spelling are at third grade level and of no practical application. Joey's claim that he "reads books" is an immature effort at impressing and reveals limited awareness/insight as to how transparent his manipulation.

Oral communication initially superficially appears to be above borderline to defective caliber. Pursuit of in-depth explanation of his ideas reveals a shallow understanding with very little knowledge beyond the obvious. Under pressure, he becomes confused and in a childish manner may offer implausible explanations and/or fabricate and/or rigidly adhere to his answers despite obvious data to the contrary.

*Memory:* Recall of thoughts, feelings and events can become easily confused by passage of time and/or intellectual complexity and/or stressed attention span and concentration. When unable to accurately recall, he may fabricate in an attempt to hide his lapse and/or to please and be accepted by whoever he is communicating with. Essentially, memory is unreliable and can be manipulated by others.

*Psychomotor:* Joey is more comfortable and productive with tangible tasks of a simple, repetitive manual-mechanical nature than those relying on language skills. Pressure to learn and/or produce quickly, however, causes him to become slower and/or less attentive to details. For occupational purposes, Joey requires a structured, non-demanding environment with opportunity for close encouragement, guidance and support when necessary. Abilities Center School advised job training in routine food service delivery that did not require independent reasoning or planning.

*Reality:* There is no manifestation of delusions or hallucinations although some evidence was detected during prior hospitalizations. Within his capacity for elementary reasoning and the absence of any emotional duress, Joey can realistically assess events and/or relationships and remain in satisfactory contact with the external world. Should intellectual, emotional or social demands prove stressful then objective analysis and reasoning deteriorate, emotions overwhelm disciplined behavior so that he no longer can exercise logical and self-controlled behavior. This has been a life-long chronic pattern.

*Emotions:* Joey operates on a eight to ten year old level with poor capacities for purposeful and self-disciplined behavior under stress. Surface behavior in supportive, caring and tolerant surroundings that are not perceived as challenging can prove adaptive. This is a thin veneer and when Joey becomes upset, he is potentially explosive and incapable of employing sufficient will over behavior.

When self-control deteriorates, Joey lacks intellectual and emotional strength to maintain a reasonable level of adjustment and adaptation. He rapidly and powerlessly regresses to impulsive acting out of immediate feelings and desires without awareness of the possible seriousness of his misbehavior.

*Social:* Social relationships are very dependent, immature and shallow. In

---

22. Because of insufficient reading ability, the defendant could not do the MMPI.

relating that he plays "tag" or with "matchbox cars" he exhibits no understanding of how such a level of social interaction is exceptionally inappropriate and childish for his chronological age.

*Conscience:* Knowledge of simple right and wrong, acceptable and unacceptable behavior is sufficient for routine, daily adjustment when not under stress. He is motivated to conform and comply with society's rules. Guilt has the potential for constructively effecting behavior when calm. When functioning on a child's level, under stress, despite the knowledge, motivation and guilt that may be potentially productive, conscience becomes immobilized. Following the uncontrollable acting-out he is calmer, will recognize having done something wrong, appropriate remorse will be evident and he will know that he deserves punishment.

*Sexual:* There is no evidence of sexual obsession or uncontrollable urges specifically limited to sexuality. There is no indication that Joey is inclined to stalk or prey upon a chosen victim. The sexual behavior accompanying his assault was a product of instant strong urges acted upon in a bizarre manner.

*Violence:* There is no evidence of preoccupation with violence. When disturbed, loss of rational thinking and emotional stability may result in uncontrollable regression to primitive behavior.

Based upon the defendant's history and test results, Dr. Weintraub concluded as follows:

1. Joey intellectually functions in the mental defective, mild range.

2. Psychosocial development and skills are fixated within the eight to ten year old level of functioning and adaptation.

3. Tolerance for frustration and impulse suppression have been chronically severely handicapped resulting in repeated incidents of overpowering and uncontrollable agitation and acting out.

4. At the time of the murder, Joey did not have the capacity to appreciate the wrongfulness of his behavior.

5. Joey requires commitment to the forensic unit of a psychiatric hospital.

6. Joey is not competent to cooperate in the preparation and presentation of his defense and to stand trial.

Dr. Weintraub testified that he thinks of the defendant as "an 8 to 10 year old child" who likes tag and playing with matchbox cars. During the interviews, Dr. Weintraub said he had to repeat questions repeatedly in order to maintain communication with the defendant. He remarked that the defendant was fearful of being taken out of his cell and taken "to the basement for experimentation purposes."

Defense counsel asked Dr. Weintraub if the defendant had an ability to meaningfully communicate with counsel. Dr. Weintraub opined that the defendant would be handicapped in this area due to his impaired memory and impaired attention span. When asked whether the defendant had the ability to follow testimony, retain it and draw upon it at a later point, Dr. Weintraub noted that the defendant can't even do the alphabet and would not be able to effectively cooperate. He noted that the defendant "has no real understanding of what's going on" and that he would not be able to contribute "beyond his physical presence." Dr. Weintraub was asked if the defendant could testify on his own behalf. The doctor felt that because of the defendant's memory, attention and concentration handicaps, he would not be able to participate effectively. He concluded that the defendant had not made it in life; he would, therefore, not make it in a courtroom. Dr. Weintraub concluded that the defendant's ability to participate would be at an eight to ten year old level.

Dr. Weintraub was the last of 17 witnesses to testify for the defense. From the evidence and testimony adduced by the defense, the Court entertains absolutely no doubt but that the defendant is a seriously impaired young man who is both mentally defective and mentally ill. Without conflicting testimony, there would appear to be little question but that the Court would declare this defendant to be incompetent to stand trial.

The State called as its first witness David E. Raskin, M.D., Chairman of the Department of Psychiatry of the Medical Center of Delaware. He is Board certified in Forensic Psychiatry, one of only 300 or so such specialists in the United States. Dr. Raskin reviewed various medical records concerning the defendant including the reports of Dr. Mechanick and Dr. Weintraub. He saw the defendant on September 20, 24, 25 and 29, 1990. He administered to the defendant the McGarry questions [23] in order to assess the defendant's competency.

Based upon his interviews with the defendant, Dr. Raskin concluded that:

With reasonable medical certainty, the following can be stated about Mr. Shields' capacities:

1. He has a factual understanding of the courtroom and its procedures.

2. He can manage his own behavior without trial disruption.

3. He appears able to relate to his attorney. I have not been able to interview his attorney to assess whether she is available to him in an empathic manner but I have no evidence that she is not. She will need to talk to him in simple language and deal in an empathic manner with his anxieties.

4. He can participate with his attorney in planning legal strategy in terms of providing her with information but he is not capable of developing a strategy with her.

5. He understands the roles of various participants in the trial. He is aware that his attorney is there to help him, he is aware there is a prosecuting attorney.

He is aware that there is a judge and jury. He is not entirely clear about the roles of each but can be educated further about this.

6. He has a gross understanding of courtroom procedure. He understands that the jury at some point will decide about what happens to him.

7. He appreciates the charges against him. He understands that he is being tried for murder.

8. He understands the possible penalties including possible death, or possible life in prison. He does not understand what not guilty by reason of insanity means. He believes in all probability he will receive a life sentence. I believe he is capable of providing his attorney with available pertinent facts concerning the events. This capacity could be gleaned from the two reports, one by Dr. Weintraub and one by Dr. Mechanick, which discuss and summarize what happened at the time of the crime. These reports appear to me to be reasonably consistent.

In addition, I have found his memory to be quite good in terms of reporting past events, doctors who have treated him, hospitalizations, etc. He will be able to assist his attorney in challenging prosecution reports about him. If he is given structured and simple questions, I believe he can testify relevantly.

9. He is not entirely motivated towards self-defense since he feels depressed and guilty about what he has done. He is certainly, however, motivated towards participating with his attor-

---

**23.** The McGarry questions are also known as the Competency to Stand Trial Instrument which Dr. Raskin described as a widely used assessment procedure in the area of competency to stand trial. The McGarry questions, (State's Exhibit 6) are as follows:

"Performance of defendant role may require the ability to

1. Consider realistically the possible legal defenses.
2. Manage one's own behavior to avoid trial disruptions.
3. Relate to attorney.
4. Participate with attorney in planning legal strategy.
5. Understand the roles of various participants in the trial.
6. Understand court procedure.
7. Appreciate the charges.
8. Appreciate the range and nature of possible penalties.
9. Perceive realistically the likely outcome of the trial.
10. Provide attorney with available pertinent facts concerning the offense.
11. Challenge prosecution witnesses.
12. Testify relevantly.
13. Be motivated toward self-defense."

ney in any way she feels would be helpful for him.

10. I do not believe he has the capacity to realistically consider possible legal defense.

In his summary, Dr. Raskin related as follows:

Mr. Shields has factual understanding of his charge, the consequences of this charge and the legal system that will try him. I do not believe he has the ability to appreciate or reason about the more abstract issues involved in the courtroom trial procedure. I believe he does have the capacity to relate well, listen to, and help his attorney. His attorney must be aware of the ways of relating to mildly retarded persons that will minimize anxiety and distraction and maximize useful participation. The psychiatric condition which limits his capacity is mental retardation of a mild degree. I have seen no clinical evidence of attention deficit disorder. He concentrates on what I ask or tell him and his next day memory is excellent. The treatment method for increasing capacities in mentally retarded persons who are educable would be through educational programs. In the interest of being thorough, I will interview Mr. Shields to determine the effect going to court has had on his mental status.[24]

Dr. Raskin concludes his report with a recommendation that the trial judge should interview Mr. Shields to determine whether his intellectual capacity is sufficient to meet the Court's standards.[25]

Of the defendant's diagnosis of Attention Deficit Disorder, Dr. Raskin remarked that persons so diagnosed do poorly in unstructured class situations but do well in one to one relationships. Dr. Raskin, therefore, wondered why defense counsel has difficulty communicating with her client, the defendant. Dr. Raskin recounted the defen-

dant telling him, in effect, that his attorney told him she felt he shouldn't be in prison. He should be in the Delaware State Hospital getting help. Dr. Raskin noted that the defendant understands very clearly that, if he is found to be incompetent, he doesn't have to stand trial. He's afraid of trial and the consequences of a life sentence or execution. The defendant is scared, according to Dr. Raskin, who noted that every inmate is painfully aware of the consequences of going to trial. Dr. Raskin felt that neither mental retardation of a borderline to a mild degree nor Attention Deficit Disorder hurts the defendant's ability to work with his attorney. The doctor noted that in Dr. Weintraub's own testing, there was not a single note about the defendant not being able to concentrate, and that Dr. Kozma noted in his report that the defendant is able to sit still and concentrate for an hour at a time.[26]

Dr. Raskin also opined that persons with mild mental retardation or Attention Deficit Disorder do not suffer from memory impairment, and he noted that what the defendant has told three doctors shows a very good memory. When the defendant gets anxious, however, he'll have more difficulties. Dr. Raskin suggested that the trial be structured with regard to the number of recesses so as to minimize the difficulties relating to memory. As to the defendant's ability to recall events, Dr. Raskin felt that if the defendant knows he is going to go to trial, he'll be able to do so. As to the defendant's feelings of guilt and depression, Dr. Raskin felt that such feelings would not reach the point of impeding him in his ability to follow the course of the trial, and that these responses are all expected in that anyone charged with murder will have the same feelings.

On cross-examination,[27] Dr. Raskin agreed that through all of the defendant's medical records, there was a clear and con-

24. *See:* State's Exhibit 5.

25. Such an interview is discussed *infra.*

26. Dr. Frederick Kozma's Psychological Test Results report dated May 24, 1985, *supra. See:* Defendant's Exhibit 4.

27. Defense counsel's cross-examination of Dr. Raskin was, to say the least, vigorous. Yet, Dr. Raskin was steadfast in his conclusion that all of the diagnoses do not answer the central question of capacity to stand trial.

sistent pattern of developmental disorders and severe emotional problems. He opined that while the defendant has severe handicaps, this fact was not the issue as he understood it.

Dr. Raskin concluded from the September 29, 1990 interview that, for good reason, the defendant had induced incapacity since he has the idea that it would be better to be at the Delaware State Hospital than standing trial.

Detective Allen Ruth of the New Castle County Police Department was next called by the State. He testified about the circumstances surrounding the arrest of the defendant and the statements obtained from him. While he stated that he knew from a conversation he had with Mrs. Shields that the defendant was slow, had a short attention span and difficulty in communicating with adults, Det. Ruth felt that the defendant understood his rights and gave the statement because, as the defendant told him, he wanted to get something off his chest. Det. Ruth did not observe any concentration problems vis-a-vis the defendant during his interview with him. He noted certain discrepancies between the defendant's statement and the contents of the Autopsy Protocol.[28]

On rebuttal, the defendant's father was recalled to the stand and testified that he told his son as he was being taken from Mr. Shields' New Jersey residence on April 9, 1990 that "You should have a lawyer." He further testified that the defendant responded, "Yes. I want a lawyer."[29] Also called in rebuttal was Lt. Dennis Godek who had investigated two incidents in 1985 concerning the defendant's possible involvement with two young females, ages 4 and 2. Although Lt. Godek testified that when he interviewed the defendant on August 7, 1985, he felt the defendant understood that what they were talking about was serious, the police report noted that "Joseph was not interviewed for a great deal of time due to his emotional condition," and that there would be "no prosecution of Shields due to his mental condition and the victim's inability to provide further info or to testify."[30]

Following the hearing and oral argument, the Court decided that an interview of the defendant by the Court would be appropriate. This was accomplished on November 9, 1990.

During this colloquy, the Court noted that the defendant gave appropriate responses to most of the questions. There seemed to be little delay between question and response. While the Court had to keep the questions simple, knowing that it was dealing with a person of very limited intelligence, nevertheless I did note that the defendant seemed to follow most of the questions with no real loss of concentration. The following exchange is provided as an example:

Q. Okay. Now do you think there will be a jury there or not?

A. I don't know if there is or not.

Q. All right. Now, if there is, tell me what you think a jury would do.

A. Well, jury is supposed to hear both sides of the story, and they come up to you and they tell you that they decided.

Q. And based on what? What would they make their decision on?

A. See if you're guilty or if you're not guilty.

Q. How would they decide that?

A. Mostly they would talk at night-time or during the day.

Q. Would they decide that—strike that.

You just told me that a jury might make a decision after talking about it.

A. Yeah.

Q. But how—I mean, on what would they make that decision?

A. What decision?

Q. Yes.

---

**28.** Counsel inadvertently omitted to introduce the Autopsy Protocol during the hearing. Without objection, a copy thereof was later submitted by the State and marked by the Court as State's Exhibit 12.

**29.** Because there are several suppression motions pending, the Court will not herein address this suppression issue.

**30.** *See:* Defendant's Exhibit 17.

A. I really don't know what decision they can make.

Q. I'm not asking about the actual decision. If you—would they make a decision based on what they heard?

A. Mostly, yes.

Q. Okay. And where would they hear that?

A. Mostly in a courtroom.

Q. Okay. If we go to trial in this case, do you want to tell the jury your side of the story?

A. No.

Q. How come?

A. Because I really don't know why.

Q. You don't know why what?

A. I just don't know why.

Q. Why what?

A. Talk to anybody that much.

Q. I'm sorry?

A. I just don't know if I want to talk to the jury.

Q. Okay. But if you did want to talk to the jury, would you tell the jury the truth?

A. Yes.

Q. Would you want the jury to be fair?

A. Mostly, yes.

Q. Okay. Have you ever heard of the term railroaded?

A. Railroaded?

Q. Yeah.

A. No.

Q. You never heard of that term?

A. (Defendant shook head in the negative.)

Q. Okay. You wouldn't want the jury to be unfair; would you?

A. I don't know. I really don't know what you mean.

Q. Okay. Well, let me put it this way. You have kind of told me that a jury makes a decision by what they hear in a courtroom; right?

A. Yes.

Q. Now, you want that decision to be the right decision. Don't we all want that?

A. Yeah.

Q. All right. Now—just as we don't want them to make a wrong decision, and we want them to be fair rather than unfair. Would you agree with that?

A. Yeah.

Q. Now, can you tell me why you agree with that?

A. I agree with that because it's like if you do get something, you done a crime, you have to—they have to hear both sides of the story. And that's—when they hear both sides, that's when they make a decision.

Q. Okay. And you want them to make that decision based on what they heard and not on any other factors?

A. That's right.

Q. Would that be a fair statement?

A. Yes.

Q. Okay. Would you follow the advice of your lawyer, Ms. Perillo?

A. Yes, I would.

Q. And why would you—why would you follow her advice?

A. Because in terms—I wouldn't understand all those things.

Q. So you would put your trust in her?

A. Yes.

Q. Is that what you're saying to me?

A. (Defendant nodded head in the affirmative.)

Q. Okay. Do you listen to her when she talks to you?

A. Yes, I do.

Q. Do you understand what she tells you?

A. Most of the time. Sometimes I don't.

Q. Okay. And when you don't, why don't you understand?

A. Because some words are very big and they get me confused.

Q. Okay. You mean, you don't understand some of the words she uses?

A. Yes.

Q. If we do go to trial, what can happen to you?

A. Mostly get sentenced, or there is a lot of other terms that I don't think of

right now, mostly because they mostly get me upset.

Q. Do you know if we go to trial how many options a jury might have, how many decisions they could make?

A. No, I don't really know.

Q. Okay. Can we go over them together?

A. Yes.

Q. Okay. And I want you to see if you can help me out. First of all, they can find you guilty. Do you understand what I mean by that?

A. Yeah.

Q. Do you understand what I mean?

A. Yes.

Q. That would be a decision they would make. What else could the jury do?

A. Mostly say you're innocent.

Q. Okay. They can find you not guilty. That's another thing they could do; isn't it?

A. Yeah.

Q. Now, if they found you guilty, what could they decide with regard to your sentence?

A. Maybe life, two life, three.

Q. Anything else?

A. No, I can't think of anything else.

Q. Okay. Now, when you say life, tell me what you mean by that.

A. What I mean by that? That's where you live there for permanent.

Q. Okay. Until when?

A. Until whenever you die.

Dr. Raskin, as mentioned previously, recommended that the Court conduct an interview with the defendant. But this fact was not the sole predicate for conducting such an exercise. Following the hearing, the Court listened to State's Exhibit 10, the taped statement given by the defendant to the police on April 10, 1990. While there were some leading questions noted by the Court, again, the Court was struck by the appropriate responsiveness of the defendant to overall questioning. The Court

wanted to see for itself whether its characterization of the April 10, 1990 taped interview had been properly inferred.

This, then, is the substance of the evidence adduced on the issue of competency to stand trial. An analysis of the legal authorities which have examined this issue is now in order.

## ANALYSIS

The test for determining competency is codified at 11 *Del.C.*, § 404(a) which states, in relevant part, as follows:

Whenever the court is satisfied, after hearing, that an accused person, because of mental illness or mental defect, is unable to understand the nature of the proceedings against him, or to give evidence in his own defense or to instruct counsel on his behalf, the court may order the accused person to be confined and treated in the Delaware State Hospital until he is capable of standing trial. . . .

██ The above-quoted statute is simply another way of stating the test of legal competency, that is: Whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

In *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1974), the Supreme Court impliedly added to the *Dusky* competency formulation the requirement that a defendant be able to "assist in preparing his defense." 420 U.S. at 171, 95 S.Ct. at 903, 43 L.Ed.2d at 113. *Dusky* and *Drope* have established a basic norm, understandably and necessarily imprecise, that permits individual judges to evaluate each case in the light of an individual defendant's level of functioning in relation to the complexity of the case.[31]

---

**31.** *See:* Slovenko, *The Developing Law on Competency to Stand Trial*, 5 J. Psychiatry & L. 165 (1977).

The Court is mindful that due process requires that a defendant be competent to stand trial, *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), and understands that the placement of an incompetent defendant before a jury on the issue of guilt or innocence does not reflect "a reasoned interaction between an individual and his community" but rather societal "invective against an insensible object." [32] At the same time, "[d]ue process requires that the defendant be afforded a fair, not a perfect trial, and that he be able to consult with his lawyer with a reasonable, not a perfect degree of rational understanding." *State v. Wynn*, Del.Super., 490 A.2d 605, 610 (1985). As one Court noted:

Competency is, to some extent, a relative matter arrived at by taking into account the average level of ability of criminal defendants. We cannot, however, exclude from trial all persons who lack the intelligence or legal sophistication to participate actively in their own defense. That is not the standard by which we measure competency. Should we do so, we would preclude the trial of a number of people who are, indeed, competent to stand trial as understood in the law. The accused need not understand every legal nuance in order to be competent ...

*State v. Guatney*, 207 Neb. 501, 299 N.W.2d 538 (1980).

Courts have looked to numerous factors in order to make a legal assessment on the competency issue. As defense counsel points out in her October 15, 1990 Memorandum of Authorities, the Delaware Supreme Court in *Harris v. State*, Del.Supr., 410 A.2d 500 (1979), indicated that mental retardation, any accompanying mental illness or disorder, and defense counsel's experience with the defendant are proper areas for exploration and consideration when attempting to determine competency. *Id.* at 501–502. Yet, the task is often easier said than done.

It is extremely difficult for trial courts to reach a decision on a defendant's competency to stand trial if the defendant is neither manifestly unable to understand the proceedings against him and to assist in his own defense nor manifestly able to understand the proceedings against him and to assist in his own defense. Competency is not something a person wears like a coat.

*State v. Heger*, N.D.Supr., 326 N.W.2d 855, 861 (1982).

■ The situation is one where the totality of the circumstances, "the aggregate of a defendant's indicia of incompetence should be considered, although any one factor may be sufficient in some circumstances." *U.S. v. Renfroe*, 825 F.2d 763, 767 (3rd Cir.1987), citing *Drope v. Missouri*, 420 U.S. at 180, 95 S.Ct. at 908, 43 L.Ed.2d at 118. The Court must consider the full range of circumstances, but is not necessarily bound by any one of them, because the determination of competency is "not susceptible to generalized concepts, or theories, but must be based upon the facts of the particular case." *Cf. Renfroe, supra* at 767 (discussing what evidence suffices to trigger the need for a competency hearing). The issue of competency remains a very fact-sensitive inquiry. "The question [of competence] is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope v. Missouri*, 420 U.S. at 180, 95 S.Ct. at 908, 43 L.Ed.2d at 118.

■ Defendant's counsel cites *Parson v. State*, Del.Supr., 275 A.2d 777 (1971), as authority for the proposition that amnesia and/or memory impairment is a factor to be considered in assessing competency to stand trial. Based on this proposition, counsel argues that the defendant, due to his mental retardation and various developmental disorders, suffers a memory impairment which equates with the amnesia as found in *Parson*. I disagree.

*Parson* dealt with a situation where the defendant suffered *total amnesia* as to the events and time frame of the alleged crime. The Court, relying on *Wilson v. U.S.*, 391 F.2d 460 (D.C.Cir.1968), adopted a list of guidelines to be considered in a case where

---

**32.** *See: ABA Criminal Justice Mental Health Standards*, 7–4.1 Commentary at p. 170 (1989).

total amnesia exists.[33] One of these factors was whether or not the memory lapse would prevent the defendant from asserting any available defense, such as alibi or insanity.[34] Thus, if the State were relying on an eyewitness, or the defendant interposed an insanity defense, amnesia as to the events of the alleged crime could require a finding of incompetency. *Parson, supra,* at 786–787; *U.S. ex rel. Parson v. Anderson,* 481 F.2d 94, 95, 96 (3rd Cir.1973) (Federal *habeas* proceeding in same action).

In *U.S. ex rel. Parson, supra,* the Third Circuit Court of Appeals, when considering Parsons' appeal of denial of his habeas petition, stated further that if the State had relied on statements made by Parson during the period covered by his amnesia, competency also would be very questionable. *Id.* at 96.

Defense counsel asserts that because the defendant will interpose an insanity defense and also because the State will apparently rely on the defendant's statement in its case in chief, the defendant must be found incompetent under the *Parson* rationale. However, to my mind, there are significant differences which militate against such an application.

The defendant in *Parson* suffered total amnesia as to the events immediately before, during and subsequent to the commission of the crime charged. Here, the defendant apparently suffers some memory impairment, but clearly not total amnesia.

He was able to give a very detailed description of the sequence of events surrounding the incident in question in response to questioning by police. He later went over the events surrounding the incident in his second interview with Dr. Mechanick and in an interview with Dr. Weintraub. Although these three accounts differ somewhat, they are substantially the same and are clearly consistent in many details. To my mind, this indicates that any memory impairment suffered by the defendant is not such an impediment to his ability to assist his defense counsel as to render him incompetent to stand trial.[35]

Finally, there is the question of using the defendant's statements against him, an issue raised by the Third Circuit Court of Appeals in *U.S. ex rel. Parson, supra.* In that case the statements in question were made to the police during the period of which Parson had no memory and within a short time after the commission of the crime. Here the statement given by the defendant was taken more than a day after the event. It was not a statement just blurted out while the defendant was in shock and which he now is unable to remember. The *Parson* rationale is plainly inapplicable in this case without an unjustified quantum expansion of its application.

Defense counsel has cited to the Court several authorities from other jurisdictions which arguably support a finding of incompetence in the matter *sub judice.* Although all are quite similar to the facts under consideration, obvious differences

---

**33.** The *Wilson* guidelines to be considered are as follows:

"1. The extent to which the amnesia affects his ability to consult with his lawyer;

2. The extent to which the amnesia affects the defendant's ability to testify in his own behalf;

3. The extent to which the evidence in the suit could be extrinsically reconstructed in view of the defendant's amnesia including evidence relating to the crime itself, as well as any reasonably possible alibi;

4. The extent to which the government assisted the defendant and his counsel in that reconstruction;

5. The strength of the prosecution's case; that is, whether it is such as to negate all reasonable hypothesis of innocence. In this connection, if there is any substantial possibility shown by the evidence that the accused could, but for his amnesia, establish an alibi or other defense, then it should be presumed that he would have been able to do so; and

6. Any other facts and circumstances which would indicate whether or not the defendant had a fair trial."

**34.** *But see* Senior Circuit Judge Fahy's dissent in *Wilson,* where he stated that, even with the protections afforded by the guidelines, it was still a violation of due process to find the defendant competent. He also felt it to be a violation of the defendant's Sixth Amendment right to the effective assistance of counsel.

**35.** As there were no eyewitnesses to the alleged crimes, the Court need not consider this *Parson* factor.

again lead the Court to the conclusion that they are not sufficiently persuasive.

Of the eight authorities cited by defense counsel, three deal with the issue of whether a competency hearing should have been held. *Williams v. State*, Tex.App., 628 S.W.2d 848 (1982), *Hill v. State*, Fla.Supr., 473 So.2d 1253 (1985), and *Silverstein v. Henderson*, 706 F.2d 361 (2nd Cir.1983), all deal with the quality and quantum of evidence necessary to invoke the need for an evidentiary hearing as to competency.

As stated in *Williams v. State*, the Court must:

> ... assay just the evidence tending to show incompetency, putting aside all competing indications of competency, to find whether there is some evidence, a quantity more than none or a scintilla, that rationally may lead to a conclusion of incompetency.

*Id.* at 851 (*quoting Sisco v. State*, Tex.Cr. App., 599 S.W.2d 607 (1980)).

This is not the standard by which one's competency is appraised at an actual hearing. Admittedly, factors relevant to whether inquiry as to competency is constitutionally necessary are also relevant regarding the actual issue of competency itself. The three cases cited clearly found sufficient evidence to support the need for a hearing, but made no claim or comment beyond that point. Moreover, there is no indication that the evidence adduced would, in the respective courts' opinions, be sufficient to support a claim of incompetency.

■ Mental retardation by itself is not usually sufficient to support a finding of incompetence to stand trial, i.e., "being mentally retarded is neither a necessary nor sufficient condition for being found incompetent...." *State v. Heger, supra* at 859; *but see, State v. Rogers*, La.Supr., 419 So.2d 840 (1982) (defendant so severely retarded that in some critical areas had capacity of three year old and found incompetent.) Almost invariably, where a mentally retarded defendant has been found incompetent, the retardation has been accompanied by some form of extreme psychological/psychiatric disorder. This is true in four of the cases cited by defense counsel. *See: State v. Flores*, La.Supr., 315 So.2d 772, 774 (1975) (defendant unable to distinguish between his fantasies and actual past events, as well as subject to psychotic episodes); *Owens v. State*, Tenn. Cr.App., 561 S.W.2d 167, 169 (1978) (evidence that defendant was so mentally disturbed that he was not able to defend himself required competency hearing); *Silverstein, supra* at 362, 369 (evidence that defendant had long institutional history as well as previous diagnoses finding him retarded and possibly schizophrenic triggered need for competency hearing); *Strickland v. Francis*, 738 F.2d 1542, 1544–1546 (11th Cir.1984) (defendant retarded and suffering from severe mental disorder—periods of irrationality, delusions of persecution by the CIA, paranoia, and frequently having no grasp of the world around him).

The defendant has been diagnosed as suffering from no such psychotic disorder, but rather mild or borderline Mental Retardation,[36] Attention-deficit Hyperactivity

---

**36.** *See generally: Diagnostic and Statistical Manual of Mental Disorders* (3rd Ed.—Revised 1987) (hereinafter DSM–III–R), pp. 28–33. "Diagnostic criteria for Mental Retardation:
A. Significantly subaverage general intellectual functioning: an IQ of 70 or below on an individually administered IQ test....
B. Concurrent deficits or impairments in adaptive functioning, i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group in areas such as social skills and responsibility, communication, daily living skills, personal independence, and self-sufficiency.
C. Onset before the age of 18. * * *
Behavioral symptoms commonly seen in Mental Retardation include passivity, dependency, low self-esteem, low frustration tolerance, aggressiveness, poor impulse control, and stereotyped self-stimulating and self-injurious behavior. In some cases, these behaviors may be learned and conditioned by environmental factors; in other cases, they may be linked to an underlying physical disorder....
The prevalence of other mental disorders is at least three or four times greater among people with Mental Retardation than in the general population. * * *
People with Mental Retardation are particularly vulnerable to exploitation by others, such as being physically and sexually abused or being denied rights and opportunities...."

Disorder,[37] as well as intellectual developmental deficits.[38] Conflicting testimony has been offered as to the further diagnosis of a Conduct Disorder.[39] However, assuming *arguendo* that the diagnosis of Conduct Disorder is correct, even in combination with Attention-deficit Hyperactivity Disorder, mild or borderline Mental Retardation and intellectual developmental deficits, it would not appear to this Court to be so disabling as to automatically trigger a finding of incompetency to stand trial. In fact, for the reasons which follow, I reach the opposite conclusion. A defendant is competent to stand trial if he understands questions, terms, and proceedings which

are put to him in simple words, perhaps using very concrete examples. *See: U.S. v. Glover*, 596 F.2d 857, 865 (9th Cir.1979). Counsel would have to do no less if the defendant were an actual child whose chronological age matched his mental age and who was being tried as an adult on a charge similar to the one here. *See:* 10 *Del.C.*, § 921(2) a.

Two of the cases cited by defense counsel presented situations where physical or developmental speech impediments or deficits made any effective communication almost impossible. *Hill, supra* at 1254 (defendant had severe speech problem which made communication with others difficult

---

**37.** *See generally: DSM–III–R*, pp. 50–53. "The essential features of [Attention-deficit Hyperactivity Disorder] are developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity. People with the disorder generally display some disturbance in each of these areas, but to varying degrees. * * *

In older children and adolescents, the most prominent features tend to be excessive fidgeting and restlessness rather than gross motor overactivity. Inattention and impulsiveness may contribute to failure to complete assigned tasks or instructions, or careless performance of assigned work. * * *

Associated features vary as a function of age, and include low self-esteem, mood lability, low frustration tolerance, and temper outbursts. * * *

Follow-up studies of clinic samples indicate that approximately one-third of children with ADHD continue to show some signs of the disorder in adulthood. Studies have indicated that the following features predict a poor course: coexisting Conduct Disorder, low IQ, and severe mental disorder in the parents. * * *

In Mental Retardation there may be many of the features of ADHD because of the generalized delay in intellectual development. The additional diagnosis of ADHD is made only if the relevant symptoms are excessive for the child's mental age."

**38.** *See generally: DSM–III–R*, pp. 39–41. "[These are] disorders that are characterized by inadequate development of specific academic, language, speech, and motor skills and that are not due to demonstrable physical or neurologic disorders, a Pervasive Developmental Disorder, Mental Retardation, or deficient educational opportunities. * * *

[However] a diagnosis of Mental Retardation in a child does not preclude the additional diagnosis of a Specific Developmental Disorder. For example, a child with an IQ of 60 should, with adequate schooling, be able to read simple materials. If the child's ability to read is markedly

below what would be expected given an IQ of 60, both Mental Retardation and Developmental Reading Disorder should be diagnosed."

**39.** *See generally: DSM–III–R*, pp. 53–56. "The essential feature of [Conduct Disorder] is a persistent pattern of conduct in which the basic rights of others and major age-appropriate societal norms or rules are violated. The behavior pattern typically is present in the home, at school, with peers, and in the community. The conduct problems are more serious than those seen in Oppositional Defiant Disorder.

Physical aggression is common. Children or adolescents with this disorder usually initiate aggression, may be physically cruel to other people or to animals, and frequently deliberately destory other people's property (this may include fire-setting). They may engage in stealing with conforntation of the victim, as in mugging, purse-snatching, extortion, or armed robbery. At later ages, the physical violence may take the form of rape, assault, or, in rare cases, homicide.

Covert stealing is common. This may range from 'borrowing' others' possessions to shoplifting, forgery, and breaking into someone else's house, building, or car. Lying and cheating in games or in schoolwork are common. Often a youngster with this disorder is truant from school, and may run away from home." * * *

Self-esteem is usually low, though the person may project an image of 'toughness.' Poor frustration tolerance, irritability, temper outbursts, and provocative recklessness are frequent characteristics. Symptoms of anxiety and depression are common.... Academic achievement, particularly in reading and other verbal skills, is often below the level expected on the basis of intelligence and age.... Attentional difficulties, impulsiveness, and hyperactivity are very common, especially in childhood....

Attention-deficit Hyperactivity Disorder and Specific Developmental Disorders are common associated diagnoses...."

and made him unable to defend himself when unjustly accused of something); *State v. Williams*, La.Supr., 381 So.2d 439, 440 (1980) (defendant had severe speech disorder and marked speech impediment which resulted in an impaired ability to communicate and thus disabled him both in advising counsel of facts pertinent to his defense and in testifying). A third case presented what appears to have been a psychologically based inability to communicate meaningfully about the case. *Strickland, supra* at 1544 (defendant was "unable to communicate in any fashion about the incidents relating to his arrest or pending trial") and n. 3 (description of "nonsense" conversation between counsel and defendant).

In the instant case, however, the defendant is able to both comprehend questions and respond fairly promptly with appropriate answers. There appears to be no evidence of any speech impediment nor a psychological inability to communicate. The defendant's ability to communicate, limited though it may be, is apparent from listening to the tape of his interview with the police and from reviewing the transcript of the Court's November 9, 1990 colloquy with the defendant.

Finally, four of the cases cited by defense counsel dealt with appellate review of the actual competency determination. In all four cases, the trial court's determination of competency was reversed as being clearly against the weight of the evidence. These were all situations in which strong consistent independent expert testimony was rejected for little or no logical reason. For example, in *Strickland, supra*, a two-member Sanity Commission of state-employed psychiatrists found the defendant incompetent based on an extensive

and consistent history of severe mental/emotional problems. The jury chose to disregard this expert testimony in favor of lay opinion testimony that the defendant was feigning his symptoms.

The Eleventh Circuit determined that there were no objective reasons for the jury to reject the expert testimony,[40] especially where the primary lay testimony came from a jailor who had a sixth grade education, had no psychiatric or psychological training, did not have any knowledge of Strickland's overwhelmingly consistent mental history and scores on sophisticated psychological tests and who characterized the defendant as "intelligent" when the defendant had an IQ of 73 and was, in fact, borderline-retarded. *Strickland*, 738 F.2d at 1547, 1548, 1555.

In *State v. Rogers, supra*, a two-person sanity commission appointed by the Court found the defendant incompetent on the basis of extensive testing and interviews showing that he was too severely retarded to be held competent. Because of difficulties with obtaining transcripts of previous proceedings, a third psychiatrist was appointed and a second hearing held. One of the initial psychiatrists testified as well as the newly appointed one. The third psychiatrist found the defendant competent, but did not do any testing and, in fact, stated that no testing would change his opinion that the defendant could assist counsel at trial. *Id.* at 842.

After reviewing the evidence, the Louisiana Supreme Court stated: "Acceptance of [the third psychiatrist's] inadequately supported conclusion in the face of contrary medical opinion having a substantial factual basis was tantamount to turning the Court's judicial function over to the doc-

---

**40.** In making this determination, the *Strickland* Court assessed four factors weighing on when a finder-of-fact is justified in disregarding expert testimony in favor of lay testimony. To my mind, these same factors are also relevant when balancing different expert testimony. These factors, taken from *Brock v. U.S.*, 387 F.2d 254 (5th Cir.1967) (*quoting Mims v. U.S.*, 375 F.2d 135, 143–44 (5th Cir.1967)), are:
"(1) the correctness or adequacy of the factual assumptions on which the expert opinion is based;

(2) possible bias in the experts' appraisal of the defendant's condition;
(3) inconsistencies in the expert's testimony, or material variations between experts; and,
(4) the relevance and strength of the contrary lay [or expert] testimony."
*Brock* at 258.

tor." *Id.* at 844.[41]

The other cited cases present similar situations of rejection of supported expert testimony in favor of inadequately or non-supported testimony. *State v. Flores, supra* (trial court accepted coroner's conclusion of competency based only on defendant's own statements that he was competent, over independent sanity commission finding of incompetency). *State v. Williams, supra* (No evidence presented to support trial court's rejection of sanity commission's determination of incompetency). That is not the case here. Dr. Raskin had access to all records, testing and expert reports pertaining to the defendant, and obviously considered them in forming his opinion. It is clear that his determination of competency rests on an adequate basis, unlike the cases cited by defense counsel.

A careful reading of the *Dusky/Drope* test of competency demonstrates three distinct factors to be requisite. A defendant must be able (1) to consult with defense counsel, (2) to otherwise assist with his defense, and (3) to have both a rational and factual understanding of the proceedings.[42] How does the Court determine whether these criteria have been met? Stated otherwise, what factors should be considered by the Court in making a determination of competency?

Dr. Raskin's use of the 13 McGarry functions is helpful in enabling the Court to decide the defendant's status, vis-a-vis the above-noted three factors. Chief Justice Krivosha of the Supreme Court of Nebraska in his concurring opinion in *State v. Guatney, supra,* listed twenty factors which may facilitate the Court's arrival at the appropriate conclusion with regard to competency:

> I concur completely with the majority opinion herein. I wish, however, to make brief comment with regard to how a trial court may satisfy itself that, indeed, an accused meets the three-fold test for competency.

While the test for determining mental competency to stand trial as established in *State v. Crenshaw,* 189 Neb. 780, 205 N.W.2d 517 (1973); and *State v. Klatt,* 187 Neb. 274, 188 N.W.2d 821 (1971), standing alone, may be difficult to apply, other cases have discussed a number of factors which are of aid to a court in arriving at an appropriate conclusion. The factors which have been considered in determining competency include the following: (1) That the defendant has sufficient mental capacity to appreciate his presence in relation to time, place, and things; (2) That his elementary mental processes are such that he understands that he is in a court of law charged with a criminal offense; (3) That he realizes there is a judge on the bench; (4) That he understands that there is a prosecutor present who will try to convict him of a criminal charge; (5) That he has a lawyer who will undertake to defend him against the charge; (6) That he knows that he will be expected to tell his lawyer all he knows or remembers about the events involved in the alleged crime; (7) That he understands that there will be a jury present to pass upon evidence in determining his guilt or innocence; (8) That he has sufficient memory to relate answers to questions posed to him; (9) That he has established rapport with his lawyer; (10) That he can follow the testimony reasonably well; (11) That he has the ability to meet stresses without his rationality or judgment breaking down; (12) That he has at least minimal contact with reality; (13) That he has the minimum intelligence necessary to grasp the events taking place; (14) That he can confer coherently with some appreciation of proceedings; (15) That he can both give and receive advice from his attorneys; (16) That he can divulge facts without paranoid distress; (17) That he can

---

**41.** In fact, the third psychiatrist stated at the end of his testimony: "I would like to make a correction. I'm only saying that I feel he could assist his attorney. I'm not saying that he's competent. That's someone else's department." *Rogers,* 419 So.2d at 842.

**42.** *See: ABA Criminal Justice Mental Health Standards,* 7–4.1 Commentary at p. 170 (1989).

decide upon a plea; (18) That he can testify, if necessary; (19) That he can make simple decisions; and (20) That he has a desire for justice rather than undeserved punishment. *Wieter v. Settle*, 193 F.Supp. 318 (W.D.Mo.1961); *Raithel v. State*, 280 Md. 291, 372 A.2d 1069 (1977); Comment, Incompetency to Stand Trial, 81 Harv.L.Rev. 454 (1967).

It should be kept in mind that, in order to establish competency, it is not necessary that an accused meet all of the above factors but only that, considering the various factors as a whole, one is compelled to conclude that the accused has the capacity to understand the nature and object of the proceedings against him, to comprehend his own condition in reference to such proceedings, and to make a rational defense. By using some or all of the enumerated factors, a trial court should be aided in arriving at an appropriate conclusion.

*Guatney*, 299 N.W.2d at 545.

In *People v. Henderson*, 83 Ill.App.3d 854, 39 Ill.Dec. 8, 404 N.E.2d 392 (1980), the defendant could not have satisfied all of the McGarry functions or all of the twenty *Guatney* factors. After all, Henderson's Full Scale IQ had been scored at 62, indicative of a high grade mental defective. Yet, the Court there affirmed a finding of competency. So too in *State v. Heger, supra,* where the defendant's full-scale IQ was 70, at the upper limit of mental retardation. In *United States v. Glover, supra,* the defendant's Full–Scale IQ was reported at 67, placing him in the category of mental defective. His reading ability was between the first and second grade levels. Yet, on the issue of competency the Court stated:

> The fact that a defendant might not understand the proceedings unless they are explained to him in simple language would put an additional burden on de-

fense counsel, but certainly does not establish that the defendant is incompetent to stand trial.

*Id.* at 867.

And that is the same conclusion this Court reaches in the case *sub judice.* The Court accepts the findings of the experts that Joseph Shields, Jr., suffers from borderline or mild mental retardation (with a Full–Scale IQ of 73), has Attention-deficit Hyperactivity Disorder and other developmental disorders. Still, the fact remains that, on an unsophisticated level, the defendant functions sufficiently well to warrant a finding of competency.

Granted, the defendant does not and, indeed, cannot satisfy all of the McGarry functions or all of the *Guatney* factors which are used to assess competency.[43] Nevertheless, enough are satisfied to allow the trial to go forward.

That Dr. Weintraub and Dr. Mechanick came to the opposite conclusion is of no moment since where there is conflict in expert testimony, the fact-finder is free to adopt the opinions of some and reject others. *United States v. O'Neal,* 431 F.2d 695 (5th Cir.1970). And, while defense counsel's opinion is a factor to consider, it is not dispositive.[44] *See: State v. Heger, supra,* where the Court stated:

> We believe a trial attorney's opinion regarding a defendant's ability to understand legal concepts, which are part and parcel of the legal proceedings against him, and to assist counsel in his own defense should be given due consideration by the trial judge in making his decision about a defendant's competency to stand trial. However, just as expert medical testimony is not controlling in the court's determination of competency, neither is expert legal testimony controlling.

*Id.* at 860. *See also: Diaz v. State,* Del. Supr., 508 A.2d 861 (1986).

---

**43.** Dr. Raskin noted that the defendant is not capable of developing a strategy with his attorney and does not have the capacity to realistically consider possible legal defenses. He did note, however, that the defendant could participate with his attorney in planning legal strategy in terms of providing her with information.

**44.** While defense counsel did not testify, her views on the matter were clear from her questioning of the witnesses and through the legal arguments she made to the Court.

It must be understood that competency to stand trial is a legal, not a medical issue. *State v. Bertrand,* 123 N.H. 719, 465 A.2d 912 (1983).

> Any ... psychiatric conclusion, if arrived at, is not and cannot be legally binding. At most, it is merely opinion testimony, to be resolved by the legal *finder of fact,* in the same manner as is the testimony of all expert expressed conclusions. Any difference between legal and psychiatric disciplines respecting the latter proposition, arises from failure to appreciate that: "Opinion testimony is one of those practical anomalies of the law of evidence devised to help (the finder of fact) understand technical subjects on which they (would be) required to speculate or guess without some expert explanation." (Par. added.) See, Burger, Cir. J.'s limited, concurring opinion, *Blocker v. United States, supra,* at page 857 of 288 F.2d [853]. (Emphasis in original.)

*Wieter v. Settle,* W.D.Mo., 193 F.Supp. 318, 322 (1961).

 Because the purposes of the legal and psychiatric disciplines are different, it is not surprising that legal and psychiatric conclusions on competency to stand trial might differ as well. From a legal standpoint:

> [c]ompetency requires, at a minimum, that the defendant be sufficiently coherent to provide his counsel with information necessary or relevant to constructing a defense.

*Raithel v. State,* 280 Md. 291, 372 A.2d 1069 (1977).[45]

The United States District Court for the Western District of Missouri in the case of *Wieter v. Settle, supra,* expressed it thusly:

> ... [W]hen it is evidentially made to appear in a ... proceeding by a person under arrest status ... (1) that he has mental capacity to appreciate his presence in relation to time, place and things; (2) that his elementary mental processes are such that he apprehends (i.e., seizes and grasps with what mind he has) that he is in a Court of Justice, charged with a criminal offense; (3) that there is a Judge on the Bench; (4) a Prosecutor present who will try to convict him of a criminal charge; (5) that he has a lawyer (self-employed or Court-appointed) who will undertake to defend him against that charge; (6) that he will be expected to tell his lawyer the circumstances, to the best of his mental ability, (whether colored or not by mental aberration) the facts surrounding him at the time and place where the law violation is alleged to have been committed; (7) that there is, or will be, a jury present to pass upon evidence adduced as to his guilt or innocence of such charge; and (8) he has memory sufficient to relate those things in his own personal manner: —such a person, from a consideration of legal standards, should be considered mentally competent to stand trial....

*Id.* at 321, 322.

What is gleaned from the above authorities is that, from a legal standpoint, the competency threshold is quite low. It is neither very demanding nor exacting. The standard by which a defendant's competen-

---

**45.** Defense counsel has also raised the novel question of a preemptive claim of involuntary ineffectiveness of counsel under the terms of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This same issue was raised by Judge Fahy in his dissent in *Wilson, supra* (*see* fn. 34, *supra*). However, as noted previously, *Wilson* involved a case of total amnesia as to the commission of the alleged crime. Under that specific circumstance, arguably *no* attorney could provide an effective defense for the defendant. Thus, again arguably, a finding of incompetence was mandated because even the minimum required by *Raithel, supra,* could not be met. Yet even in *Wilson,*

the Court found the defendant competent when the guidelines discussed therein were applied. Here the defendant, unlike *Wilson,* has recall of the events, and can provide the required information to his counsel. This is not a situation where no attorney could provide an adequate defense. Present defense counsel is, in fact, providing a more than merely adequate defense as evidenced by her vigorous, intelligent and thorough advocacy on behalf of her client.

Ineffectiveness of counsel in this case would go to the failure of counsel to appropriately communicate with the defendant and/or act upon those communications. There is no such failure evidenced here.

cy is measured is not that of the reasonable person but rather of the average criminal defendant. *State v. Guatney, supra.*

Incompetency must be a relative judgment which takes into account the average level of ability of criminal defendants. Many defendants lack the intelligence or the legal sophisication to participate actively in the conduct of their defense. But enlarging the class of persons considered incompetent to stand trial to include all such defendants would fundamentally alter the administration of the criminal law. The standard of rational understanding emphasized in *Dusky* must be taken to mean no more than that the defendant be able to confer coherently with counsel and have some appreciation of the significance of the proceeding and his involvement in it. Many defendants who have some intellectual or physical handicap or emotional disturbance preventing them from functioning at their normal level of effectiveness can still meet such a standard. The question is one of degree; the purpose of the law is not to attempt to compensate all the inevitable disparities in innate abilities among defendants but to identify those instances where the purposes of incompetency law are most directly relevant.

Comment, *Incompetency to Stand Trial,* 81 Harv.L.Rev. 454, 459 (1967).

### CONCLUSION

 Based upon the findings of Dr. Raskin, the observations of Detective Allen Ruth, my own observations of the defendant, and in brief, the testimony adduced during the hearing as well as the standards enunciated in *State v. Guatney, supra, United States v. Glover, supra, Raithel v. State, supra, Wieter v. Settle, supra,* I conclude that the defendant, although mentally defective and mentally ill, possesses the mental capacity to appreciate his presence in relation to time, place and things. He grasps, with what limited intellect he has, that he has been charged with serious crimes including murder. He understands that I am a Judge, that Ms. Perillo is his

Public Defender whose job it is to defend him and that there are two prosecutors for the State. He likes his lawyer and, to the best of his ability, has told her of the facts surrounding the incident. He knows that a jury will decide whether or not he is guilty and that he can be sentenced to life in prison if convicted.[46] He is, in brief, sufficiently coherent to provide his attorney with information necessary or relevant to constructing a defense.

From the legal perspective, it is clear to the Court that the State has shown, by a preponderance of the evidence, that the defendant, while seriously impaired, is, nevertheless, competent to stand trial.

So ORDERED.

---

**46.** He declined to acknowledge to me the possibility of a death sentence.