**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| | ) | I.D. No. 1905005677 |
| v. | ) | |
| | ) | |
| SHAWN FREEMAN, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: May 9, 2025
Decided: July 22, 2025

## ORDER

### *On Defendant's Motion for Finding of Non-Competence – DENIED*

On this 22nd day of July, 2025, having considered Defendant's "Motion for Finding of Non-Competence,"[1] the State's Response,[2] the testimonies presented,[3] and the entire record in the case, it appears to the Court that:

1.     On July 13, 2020, Freeman was indicted on four counts of Rape First Degree, two counts of Unlawful Sexual Contact First Degree, and one count of Continuous Sexual Abuse of a Child.[4]  Freeman's charges stem from multiple alleged instances of sexual assault between Freeman and an eight-year-old female.[5]

---

[1] *State v. Shawn Freeman*, Crim ID No. 1905005677, Superior Court Criminal Docket Item (hereinafter "D.I.") 82.
[2] D.I. 83.
[3] D.I. 76 and 80.
[4] D.I. 2.
[5] *State v. Freeman*, 2022 WL 3011149, at *1 (Del. Super. July 27, 2022).

1

These allegations mirror similar charges brought against Freeman in 2014, which involved the sexual assault of Freeman's six-year-old female cousin.[6] Freeman confessed to that incident and the related crimes.[7]

2.     The issue of Freeman's competency to stand trial was initially raised in August of 2020.[8] At that time, the Court was presented with simultaneous motions for competency restoration (by the State) and for dismissal (by defense). In reviewing these motions, the Court, in its Memorandum Opinion, delineated a portion of the procedural history of this case:

> [t]urning to the subject case, on May 27, 2019, Defendant was arrested for sexually assaulting an eight-year-old female on multiple occasions. Defendant slept over at his 25 year-old friend's house on multiple occasions even though an eight-year-old sister of the friend was also living at the residence. The eight-year-old female claimed that on multiple occasions starting in August 2018, and continuing through February 2019, Defendant would come into her bed while she was sleeping and sexually assault her. There was also an incident in which Defendant took the eight-year-old female to the basement, removed his and her clothes, and sexually assaulted her in the basement…
>
> …Defendant was arrested on May 27, 2019, and indicted on July 13, 2020…
>
> …On August 19, 2020, Defendant was ordered to undergo a psychiatric evaluation at Delaware Psychiatric Center ("DPC") to determine his competency to stand trial. On September 10, 2020, a DPC report

---

[6] *Id.*

[7] Prior to the charges brought against Freeman in May of 2014, Freeman faced similar allegations in Pennsylvania for alleged unlawful sexual contact with two young stepsisters. Freeman underwent counseling as a result of the Pennsylvania charges.

[8] D.I. 6.

opined that Defendant was not competent to stand trial. In follow-up communications, on October 28, 2020, Dr. Douglas S. Roberts, Psy.D., from DPC advised that Defendant's prognosis for restoration of competency was guarded.

On November 2, 2020, the State filed a motion requesting that Defendant be ordered to DPC to attempt competency restoration.

On March 29, 2021, while in the thro[w]s of the COVID-19 pandemic and while the Court had declared a judicial emergency as a result thereof, Defendant and the State entered into a stipulation that Defendant was not competent to stand trial, that Defendant was to participate in out-patient counseling, that the State would not seek in-patient competency restoration at the present time, and that the Defendant was to abide by all the bail conditions imposed. The State entered into the Stipulation to allow Defendant to remain in the community and not to attempt competency restoration at DPC during the COVID-19 pandemic.

Bail was set at $500,000 unsecured with conditions of home confinement except for medical appointments, pretrial reporting, appointments with legal counsel and other legal-related appointments; must be supervised by stepfather/mother whenever leaving residence; counseling; GPS monitoring; Pretrial Supervision; no contact direct or indirect with the alleged victim; no contact direct or indirect with any child under the age of 18; cooperate with competency evaluations and treatment; and cannot access websites relating to sexual contact with children.

At a status hearing, on January 21, 2022, the State renewed its request for Defendant to report to DPC to undergo competency restoration. The State was not satisfied with the outpatient therapy Defendant had been receiving…

…On March 8, 2022, Defendant filed a motion to dismiss the pending charges on due process and speedy trial grounds.[9]

---

[9] *Freeman*, 2022 WL 3011149, at *1-2 (Del. Super. July 27, 2022).

3. The Court granted the State's renewed request seeking competency restoration and denied Defendant's Motion to Dismiss, in part because:

> competency restoration was never attempted due to the safety considerations of the COVID-19 pandemic … Having afforded Defendant, the opportunity to attempt outpatient counseling, the State has now renewed its request for admission to DPC for competency restoration. That request is reasonable under the facts and circumstances of this case.[10]

With respect to the motion to dismiss, the Court aptly noted:

> Defendant first asserted his speedy trial rights on March 8, 2022, by the filing of the subject motion. Defendant never raised speedy trial issues prior to March 8, 2022. Had he done so, the State could have immediately sought competency restoration instead of agreeing to allow Defendant to remain in the community during the COVID-19 pandemic and explore outpatient therapy. COVID-19 related safety considerations are reasonable and good-faith justification for delay and are not attributable to the State.[11]

4. As a result, on August 11, 2022, Freeman was Ordered to report to DPC for participation in the competency restoration program.[12] Defense counsel moved for reconsideration of the Commissioner's Order.[13] The Order for restoration was stayed until a hearing on the Motion could occur.[14] The State responded to the Motion on September 29, 2022.[15] Defendant replied on October 5, 2022.[16]

---

[10] *Id.* at *4.
[11] *Id.*
[12] D.I. 31.
[13] D.I. 32.
[14] D.I. 33, 35.
[15] D.I. 37.
[16] D.I. 39.

5. On October 7, 2022, a status conference hearing was held. After consideration of the motion, the Court denied it, modified Freeman's bail, and ordered him to undergo competency restoration.[17] Freeman was then taken into DPC custody for competency restoration.[18]

6. On March 22, 2023, Psy.D. Maura Hanlon filed a psychological/psychiatric report.[19] Upon review of the report, Defense counsel informed the Court of its position to renew the motion to dismiss based on Freeman's continued lack of competency.[20] The Court held a status conference, at which a competency hearing was scheduled.[21]

7. The original hearing was scheduled for July 12, 2023.[22] However, scheduling conflicts and witness availability issues delayed the hearing until September 4, 2024.[23] Given the delay, Defense counsel filed a letter with the Court asking Freeman to be placed back on home confinement.[24] The Court denied that request on January 31, 2024.[25]

---

[17] D.I. 41.
[18] D.I. 42.
[19] D.I. 47.
[20] D.I. 51.
[21] D.I. 52 and 53.
[22] D.I. 53.
[23] D.I. 55, 58, 71, and 79. Before the hearing the Court received psychological/psychiatric reports from Dr. Much, Psy. D Young, and Psy. D Huemoller.
[24] D.I. 59.
[25] D.I. 63.

8.     Freeman's competency hearing began on September 4, 2024, where testimony was given by Doctors Much and Mechanick.[26]  Post-hearing, the Court requested to hear from Mr. Freeman's treating DPC staff, "including those who work with him in his competency restoration classes" to assist in the competency determination.[27]  Therefore, the competency hearing continued on February 19, 2025.[28]

9.     At that time, the State called Marie Mckee as their sole witness, who works at DPC and oversees the competency restoration program.  In her role, she is familiar with Freeman and his participation in the restoration program.[29]  Defense did not call any witnesses, but again requested a modification of Freeman's bail to allow his return to home confinement, as opposed to Level V supervision at DPC.[30]  The State opposed, arguing that competency restoration efforts cannot be received outside of DPC.[31]  The Court denied the motion and noted that the delays in this case were not attributed to the fault of any party, and expressed concerns about community safety given the history of this case.[32]

---

[26] D.I. 69, 76 Sept. 4, 2024, Hearing Transcripts (hereinafter "Trans. p. __").
[27] D.I. 70.
[28] D.I. 79.
[29] D.I. 80, Feb. 19, 2025, Hearing Transcript, p. 3, 7 (hereinafter "Trans. p. __").
[30] *Id.*, Trans. p. 32.
[31] *Id.* at p. 33.
[32] *Id.* at p. 33-34.

10.    On May 9, 2025, both parties filed post-hearing submissions to the Court.[33]  This matter is now ripe for a decision.

Standard of Review

11.    It is a fundamental requirement of due process that a criminal defendant be competent to stand trial.  When competency is challenged, the State bears the burden to show, by a preponderance of the evidence, that the defendant is competent.[34]  "The United States Supreme Court has 'approved of a test of incompetence which seeks to ascertain whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him.'"[35]  Delaware has recognized and applied this test in assessing competency, which requires that a court determine "whether the defendant can: (1) understand the nature of the proceedings; and (2) provide evidence or instructions to counsel on the defendant's own behalf."[36]  If it is found that the defendant is unable to meet either requirement, the Court may order the defendant

_____

[33] D.I. 82, 83.
[34] *State v. Swanson*, 2024 WL 65478, at *2 (Del. Super. Jan. 5, 2024) (citing *Diaz v. State*, 508 A.2d 861, 863 (Del. 1986)).
[35] *State v. Mendez*, 2021 WL 2368130, at *1 (Del. Super. June 9, 2021) (quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1974)).
[36] 11 *Del. C.* § 404(a).

7

be confined to the Delaware Psychiatric Center and receive treatment until ready to receive competency restoration treatment.[37]

12.    The Court has used a series of factors, dubbed the "*McGarry questions*" to aid competency evaluation.  These questions inquire as to whether a defendant can:

> (1) Consider realistically the possible legal defenses; (2) Manage one's own behavior to avoid trial disruptions; (3) Relate to attorney; (4) Participate with attorney in planning legal strategy; (5) Understand the roles of various participants in the trial; (6) Understand court procedure; (7) Appreciate the charges; (8) Appreciate the range and nature of possible penalties; (9) Perceive realistically the likely outcome of the trial; (10) Provide attorney with available pertinent facts concerning the offense; (11) Challenge prosecution witnesses; (12) Testify relevantly; and (13) Be motivated toward self-defense.[38]

While the Court should consider the *McGarry* questions and Defendant's circumstances, it is "not necessarily bound by any one of them, because the determination of competency is not susceptible to generalized concepts, or theories, but must be based upon the facts of the particular case."[39]

13.    In addition to the *McGarry* questions, Delaware Courts have identified thirteen (13) other factors, known as the "*Guatney* factors" that are similarly instructive in determining competency.  These factors are:

> (1) the defendant's ability to appraise the legal defenses available; (2) the defendant's ability to plan a legal strategy; (3) level of manageable

---

[37] *Id.*

[38] *State v. Shields*, 593 A.2d 986, 100 (Del. Super. Nov. 15, 1990).

[39] *Mendez*, 2021 WL 2368130 at*1 (internal citations omitted).

behavior; (4) quality of relating to his or her attorneys; (5) ability to appraise the participants in the courtroom; (6) understanding of court procedures; (7) appreciation of the charges; (8) appreciation of the range and nature of the penalties; (9) ability to appraise the evidence and likely outcome; (10) capacity to disclose to his or her attorneys available pertinent facts surrounding the offense; (11) capacity to challenge prosecution witnesses realistically; (12) capacity to present relevant testimony; and (13) motivation for a positive outcome.[40]

The Delaware Supreme Court recently had occasion to readdress the standard for competency to stand trial in *Cooke v. State*.[41]  In so doing, the Court reiterated that "[t]he longstanding test of competency to stand trial is 'whether or not the defendant has sufficient present ability to consult with his lawyer rationally and whether he has a rational as well as a factual understanding of the proceedings against him.'"[42]  The Court also specified that "'the competency threshold is quite low.  It is neither very demanding nor exacting.  The standard by which a defendant's competency is measured is not that of the reasonable person but rather of the average criminal defendant.'"[43]  A finding regarding competency to stand trial is a legal determination, not a medical one.[44]

---

[40] *Swanson*, 2024 WL 65478, at *3 (citing *State v. Perry*, 2023 WL 8187300 (Del. Super. Nov. 23, 2023)).
[41] 2025 WL 16395 (Del. Jan. 2, 2025).
[42] *Id.* at *25 (citing *Williams v. State*, 378 A.2d 117, 119 (Del. 1997)).
[43] *Id.* at *25, citing *Tucker v. State*, 105 A.3d 990, 2014 WL 7009954, at *2 (Del. 2014) (TABLE) (quoting *Shields*, 593 A.2d at 1012-13).
[44] *Swanson*, 2024 WL 65478, at *2-3.

14.     In reviewing the *McGarry* questions and *Gautney* factors, the Court finds, for the reasons articulated below, the testimony presented supports a finding that Freeman meets the minimum standards required for competency to stand trial.

<u>Findings of Fact</u>

15.     Shawn Freeman undoubtedly suffers from a "rare congenital genetic disorder" known as 1q42.1q.43, a duplication of chromosome number 1.[45]  This disorder will manifest in "significant impairment in verbal skills, verbal memory, and is associated with intellectual disability."[46]  This fact is agreed upon by both experts and undoubtedly has an effect on Freeman's competency.[47]  The question is to what extent does this disorder impact Freeman's competency.  Freeman's IQ has been tested at both 42 and 62.[48]  Both of which are very low.

16.     Throughout the course of this litigation thus far, Freeman has been evaluated a total of eight times, by six different doctors since 2020.  At the competency hearing on September 4, 2024, while only two doctors were called to give testimony, joint exhibits were entered into evidence that not only contained Drs. Mechanick and Much's respective reports,[49] but also those of various doctors at DPC

---

[45] D.I. 69, Trans. pp. 12, 111-112.
[46] *Id.* at
[47] *Id.* at p. 73.
[48] *Id.* at p. 111.
[49] State's Ex. 1 (October 2023 Report of Dr. Mechanick); State's Ex. 2 (July 2024 Report of Dr. Mechanick); State's Ex. 3 (Dr. Mechanick *curriculum vitae*); Defense

who had performed previous competency evaluations of Freeman. These reports included: 2014 Evaluation of DPC Dr. Selig,[50] 2015 Evaluation of DPC Dr. Douglas Shultz;[51] 2020 Evaluation of DPC Dr. Douglas Roberts;[52] 2023 Evaluation of DPC Dr. Laura Lyon;[53] 2023 Evaluation of DPC Dr. Dena Young,[54] and 2024 Evaluation of DPC Drs. Jonathan Tan and Margaret Huemoeller.[55]

17.   Dr. Much first presented his testimony at the hearing. Dr. Much evaluated Freeman in June of 2023. In preparation of his evaluation, Dr. Much reviewed prior reports of Drs. Roberts, Lyons, Selig and Shultz (DPC); four reports in total.[56] Dr. Much opined Freeman does not have requisite competency to stand

Ex. 1 (June 2023 Report of Dr. Much); Defense Ex. 2 (May 2024 Report of Dr. Much).

[50] Court Ex. 1. (Finding Freeman lacked competency to stand trial and that his prognosis for restoration is "likely guarded to poor").

[51] Ex. 2. (Finding Freeman's cognitive limitations stemming from his Intellectual Disability render him incompetent).

[52] Ex. 3. (Finding Freeman was not competent to stand trial and expressing concern for Freeman's ability to "learn the amount of information necessary to become competent"). Dr. Roberts is now referred to as Dr. Schultz.

[53] Ex. 4. (Finding no change from Dr. Robert's evaluation deeming Freeman incompetent but noting "with further treatment and continued interventions on competency attainment, it is possible that he may become competent to stand trial in the foreseeable future").

[54] Ex. 5 (Finding Freeman competent to stand trial and that he "demonstrated the capacity to learn from the competency restoration education sessions and he demonstrated an adequate factual and rational understanding of competency related matters").

[55] Ex. 6. (Finding Freeman incompetent to stand trial because he appeared confused, struggled to retain education, and lacked an understanding of the courtroom proceedings or the charges against him).

[56] D.I. 69, Trans. p. 10-11.

trial. His finding largely relied upon Freeman's low IQ and score on the CAST-MR competency assessment tool in June of 2023.[57] Dr. Much acknowledged Freeman's score increased when the same assessment was given in April of 2024,[58] but maintained his position that Freeman is neither competent to stand trial, nor likely to develop the requisite competency in the future. Dr. Much explained:

> you have to understand that Shawn's intellectual disorder – intellectual developmental disorder is of the moderate kind. We're not talking about somebody whose IQ and functioning level is somewhere up in the 60-plus range, you know, where there is a level of education sometimes that folks like that can benefit from. So it would be impossible in my opinion – we can't correct his IQ. We can't correct his genetic deficit. We can't correct the deficits that he has.[59]

18.     Dr. Mechanick has twice evaluated Freeman for a competency assessment.[60] In so doing, Dr. Mechanick administered the MacCat-CA and CAST-MR tests, both of which are competency assessment tools.[61] Dr. Mechanick reported Freeman performed lower than expected on the MacCat-CA assessment, even considering his low IQ.[62] Dr. Mechanick acknowledged this score is consistent with

---

[57] *Id.* at p. 54.
[58] *Id.* at p. 54-55. In section one, "Basic Legal Concepts," Freeman's score increased from eight (8) percent to sixty-eight (68) percent. In the "Skills to Assist Defense" section, Freeman increased from forty-seven (47) percent to seventy-two (72) percent. In the final section "Understanding Case Events," Freeman scored twenty (20) percent in 2023 and forty (40) percent in 2024.
[59] D.I. 69, Trans. p. 34-35.
[60] *Id.* at p. 63.
[61] *Id.* at p. 66.
[62] *Id.* at p. 75.

a finding Freeman is not competent, however, Dr. Mechanick attributed this to Freeman's decisive lack of effort and lack of motivation to become competent.[63] He explained:

> Well, this presented a complex case, because it wasn't somebody – well, let me put it this way: It was somebody who clearly has an intellectual disability. I think there's no dispute among that. Dr. Much and I agree on that. But there was clearly some mixed evaluations about whether he was also lacking motivation to fully present as competent or feigning some deficits in competency with the goal of being not found competent and being released as a result."[64]

19. Freeman's DPC records further evidence an understanding of how his competency evaluation plays into the pending criminal proceeding, "Freeman appeared to believe that if he failed his evaluation for competency, his charges will be dropped. There was concern that he might be purposefully attempting to fail the examination for that reason."[65]

20. Dr. Mechanick considered those DPC records,[66] along with Freeman's IQ score[67] and prior evaluations of his competency[68] in finding Freeman competent. Dr. Mechanick also interviewed Freeman, who was able to accurately explain why he was at DPC, identify his rape charge as "pretty serious."[69] Freeman also

---

[63] *Id.*
[64] *Id.* at p. 73.
[65] *Id.* at p. 70.
[66] *Id.* at p. 69.
[67] *Id.* at p. 68.
[68] *Id.* at p. 73.
[69] *Id.* at p. 79.

13

accurately described the role of his attorney,[70] the judge,[71] and the jury.[72]  This

conversation with Freeman, taken in totality with his prior records and evaluations,

informed Mechanick's opinion that Freeman, under all of the *McGarry* questions,

has the requisite competency to stand trial, despite his low score on the MacCat-

CA.[73]

21.    Dr. Mechanick additionally considered information from Marie

McKee, Freeman's therapist overseeing the competency restoration program, in

assessing his competency.[74]    McKee gave Dr. Mechanick information on how

Freeman is doing day to day and responding to restoration efforts.  Dr. Mechanick

noted that McKee relayed to him that Freeman:

> Eventually demonstrated a factual and rational understanding of his
> charges and the roles of court personnel.  She said that he possessed
> decisional abilities necessary to plan and develop defense strategies.
> He exhibited the ability to consult with counsel and to behave
> appropriately during court proceedings in order to effectively assist in
> his defense.[75]

---

[70] *Id.* Freeman explained Defense counsel's role "is to help get me home and to make sure things don't go upside down."

[71] *Id.* at p. 78. Freeman described the judge as someone who "basically say[s] we're going to give you less or more time in jail or put you in a place like this" ("this" being DPC).

[72] *Id.* at p. 79 Freeman defined the jury as "someone, more than one, six or seven people, whose job is, quote, to see what's being said to see if it's true or not." Freeman also said the jury's job is to "see who's innocent."

[73] *Id.* at p. 81-89.

[74] *Id.* at pp. 66, 70-71, 82-83, 90.

[75] *Id.* at p. 71.

Dr. Mechanick asked Freeman questions akin to the *McGarry* questions and *Gautney* factors. Some of Freeman's answers were not very insightful and of note to Dr. Mechanick as being indicative of Freeman not having a full understanding, but the majority of questions answered demonstrated Freeman held an understanding of the nature of the proceedings, the charges in which he faces, and understood the "basic concepts" of the judicial system and function.[76] Dr. Mechanick's finding of competency acknowledged Freeman has limitations, but he opined that those limitations were not to such an extent requiring he find Freeman not competent; Dr. Mechanick attributed many of Freeman's insufficient answers to both his intellectual disability and as his lack of motivation to be found competent.[77]

22. In the follow up hearing, the Court heard first hand from McKee, who provided insight into Freeman's participation in his restoration classes, as that deemed to be the biggest area of disagreement between the two experts presented.[78] McKee, as Freeman's therapist, oversees the competency restoration program at DPC and has daily and firsthand knowledge of Freemans efforts, participation and progress in the program.[79] McKee testified to the competency restoration program itself, what a day looks like for the participants, and the efforts made to educate and

---

[76] *Id.* at pp. 75-81, 83-88.
[77] *Id.* at pp. 81, 89-90, 103.
[78] D.I. 79.
[79] D.I. 79, Trans. pp. 3, 7.

restore competency for their clients. McKee detailed the process for evaluations of participants in the program and explained that competency is typically reevaluated every 90 days when in the program.[80] McKee did not testify as an expert, nor did she opine on Freeman's competency.

23. McKee testified that Freeman's questions regarding the court process generally concerned his release, rather than the competency topic being addressed during any particular session.[81] She testified that recently, Freeman had been consistently attending group competency sessions regularly. He typically declined the one-on-one sessions offered.[82] The individual sessions were specifically offered to Freeman given his intellectual limitations.[83] McKee stated that she remains of the opinion she relayed to Dr. Mechanick previously, that Freeman's inability to accurately answer questions with respect to certain areas of competency appears to be as a result of his observed lack of motivation to engage in competency restoration, as opposed to cognitive limitations.[84] McKee acknowledged that Freeman has been through these competency restoration classes before and has been in the program for

---

[80] *Id.* at p. 11.
[81] *Id.* at pp. 9, 13.
[82] *Id.* at p. 8.
[83] *Id.* at p. 10.
[84] *Id.* at pp. 13-14.

16

a lengthy period of time, therefore, any appearance of lack of motivation may be attributable to this fact, as well.[85]

<u>Analysis</u>

24.     Freeman's low IQ is not in and of itself determinative.[86] A fair reading of the totality of Freeman's responses to both Drs. Mechanick and Much, in addition to his performance in competency groups with McKee, demonstrates Freeman's rudimentary understanding of both the "present ability to consult with his lawyer rationally," and "a rational as well as a factual understanding of the proceedings against him" when measured against the average criminal defendant.[87]

25.     Criminal defendants do not always possess a detailed understanding of criminal proceedings:

> "[c]ompetency is, to some extent a relative matter arrived at by taking into account the average level of ability of criminal defendants. We cannot, however, exclude from trial all persons who lack the intelligence or legal sophistication to participate actively in their own defense. That is not the standard by which we measure competency. Should we do so, we would preclude the trial of a number of people who are, indeed, competent to stand trial as understood in the law. The accused need not understand every legal nuance in order to be competent."[88]

---

[85] *Id.* at p. 20.
[86] *Shields*, 593 A.2d at 1012.
[87] *Cooke*, 2025 WL 16395, at *25, *see also Tucker*, 105 A.3d 990, 2014 WL 7009954, at *2 (quoting *Shields*, 593 A.2d at 1012-13).
[88] *Swanson*, 2024 WL 65478, at *2 (citing *Shields*, 593 A.2d at 1012).

Nonetheless, Freeman was able to identify and articulate the severity of the charges against him, provide some discussion of what led to the charges, and describe the respective roles of the prosecutor, his attorney, the judge, and the jury. Any minor inaccuracies, such as reporting the incorrect number of jurors, are not enough to tip the competency scales. Freeman provided a largely accurate description of everyone's role in the proceeding. Freeman also described his defense to Dr. Mechanick and provided detailed description of the alleged crimes.[89]

26. Freeman was also observed during the multiple proceedings held in this case ranging from bond modification hearings to the multi-day competency hearings held. At no time did Freeman act in a way that could be harmful to his defense or fail to maintain composure. All exhibits entered into evidence were thoroughly considered, which includes the party specific exhibits as well as the court exhibits. The history of this case is lengthy, but provides insight into the improvements in competency that Freeman has experienced with the help of the DPC restoration program.

27. Freeman's intellectual disability and chromosomal disorder were also considered by the Court. In reviewing the totality of both the *McGarry* questions and *Gautney* factors, as well as the history of this case, Dr. Mechanick's testimony is compelling insofar as it attributes, in part, impairment findings to Freeman's lack

---

[89] D.I. 69, Trans. p. 83.

of motivation to be found competent. Freeman has referenced on multiple occasions the fact that his previous rape charges were dropped because he was found not competent. This is of notable concern to the Court. Equally, it evidences a rudimentary understanding of the criminal justice system. In addition, while the testimony of Dr. Much was telling and important to the Court, he did not administer any tests designed to detect malingering, therefore, he understandably could not completely opine as to this point.

28. In assessing all the evidence, Freeman can realistically consider possible legal defenses, he was able to discuss plea bargains and the fact that there was "no penetration" and he did not commit the alleged crimes. Freeman maintains a sufficient ability to plan a legal strategy and has demonstrated an ability to discuss with multiple evaluating doctors defense strategy and rational thoughts in this area. As noted above, Freeman possesses the ability to manage his behavior and there is no evidence to support that his ability to maintain composure during trial is compromised. Further, Freeman is capable of communicating with and relating to his attorney. Drs. Much and Mechanick both testified to Freeman's ability to interact with them, which suggests he similarly possesses the ability to adequately relate to his attorney. Freeman, while needing prompting at times, can correctly identify the participants in the courtroom and their respective roles. He possesses a basic understanding of courtroom procedure and has an appreciation of the charges, as he

briefly gave a description of the rape charges he faced when questioned by Dr. Mechanick.[90]

29. Freeman possesses a basic appreciation for the range and nature of the penalties he faces. He similarly evidenced an ability to appraise the evidence and likely outcome, and while his understanding is not detailed or sophisticated, that is not required for a legal finding of competence. As Freeman has on multiple occasions been able to articulate facts surrounding his charges, Dr. Mechanick's opinion that he possesses sufficient capacity to disclose to counsel pertinent facts surrounding the offense and to present relevant testimony is credible. In addition, it appears from the evaluations that Freeman has sufficient legal capacity to challenge prosecution witnesses realistically, when looked at this factor in conjunction with his ability to relate with his attorney. Finally, all of Freeman's statements from the inception of this case regarding his desire to go home, and with respect to the charges being dropped if he is found not competent, evidence he has motivation for a positive outcome of his case.

30. The facts, analyzed against the totality the circumstances, show Freeman has the ability to "consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the

---

[90] Freeman told Dr. Mechanic that rape is "pushing up on somebody, with your genital body, your private area…your penis." D.I. 69, St. Ex. 1, p. 10.

proceedings against him.[91]  Therefore, the totality of the circumstanced demonstrate that Freeman's competency to stand trial has been restored.  This finding of competency is the result of a fact-specific inquiry, and no one factor presented determined Freeman's competency.[92]    The testimony presented shows Freeman meets the low threshold of competency relative to the average level of ability of a criminal defendant.

31.  Freeman undoubtedly faces significant intellectual challenges, which the parties should take seriously in working through the logistics of trial and case resolution.

32.  Freeman's "Motion for Finding of Non-Competence" is **DENIED**, as is any residual motion to dismiss, as Freeman meets the minimum standards of competency to stand trial.

**IT IS SO ORDERED.**

_____
Danielle J. Brennan, Judge

Original to Prothonotary

---

[91] *Dusky v. United States,* 362 U.S. 402, 403 (1960).
[92] This conclusion is based upon an evaluation of the *Guatney* factors, as well.

21